Argued and submitted March 9, the decision of the Court of Appeals reversed and judgment of the trial court affirmed September 19, 1989

McDONALD et al,
*Appellants,*

*v.*

HALVORSON et al,
*Respondents,*

*and*

STATE OF OREGON, by and through
the STATE LAND BOARD et al,
*Respondent on Review,*

*v.*

HALVORSON et al,
*Petitioners on Review.*

(TC A8505-05317; CA A42945; SC S35561)

780 P2d 714

Garry P. McMurry, Portland, argued the cause and filed the petition and responses on behalf of petitioners on review.

Linda DeVries Grimms, Assistant Attorney General, Salem, argued the cause on behalf of respondent on review. With her on the responses were Dave Frohnmayer, Attorney General, Virginia L. Linder, Solicitor General, and Kurt Burkholder, Assistant Attorney General, Salem.

Ben C. Fetherston, Jr., of Clark, Lindauer, McClinton, Krueger & Fetherston, Salem, filed a brief on behalf of *amicus curiae* 1000 Friends of Oregon.

Richard M. Stephens, Pacific Legal Foundation, Sacramento, California, filed a brief on behalf of *amicus curiae* Pacific Legal Foundation.

GILLETTE, J.

## GILLETTE, J.

This case began as a dispute between adjacent private property owners over access to a beach at Little Whale Cove on the Oregon coast. Because access to and use of the beach was also a matter of public concern, the state intervened. After a trial, the circuit court, in addition to resolving the dispute between the private parties, found that Little Whale Cove was not, in fact, a part of the Pacific Ocean; instead, the cove was a freshwater pool occasionally influenced by the ocean. The court then held that any beach on the cove was a private beach to which the general public had no right of access or use. On the state's appeal from this adverse judgment, the Court of Appeals reversed the trial court. It held that, under its view of the facts,[1] the cove was a part of the ocean and, in any event, the public had a right to use of the beach under the rule of *State ex rel Thornton v. Hay,* 254 Or 584, 462 P2d 671 (1969).[2] *McDonald v. Halvorson,* 92 Or App 478, 760 P2d 263 (1988). We reverse the decision of the Court of Appeals and reinstate the judgment of the trial court.

### 1. Parties and Issues

Plaintiffs McDonald and Lynch ("plaintiffs") are the owners of property on the Oregon coast adjacent to a bay of the Pacific Ocean known as "Big Whale Cove." Defendants Halvorson and others ("defendants") are the owners of the adjacent property to the north, Little Whale Cove, which is the subject of this dispute. Plaintiffs initiated this action seeking to quiet title against defendants' claim of a prescriptive easement over a trail on plaintiffs' land that connects the two coves. Plaintiffs also asked for a declaration that their property includes a portion of the "dry-sand area" of Little Whale Cove, thereby giving them (and their licensees) access to the entire "dry-sand area" of Little Whale Cove under *State ex rel Thornton v. Hay, supra.* Defendants counterclaimed for a declaration that they had a prescriptive easement giving them (and their licensees) access to Big Whale Cove. The State of

---

[1] The scope of the court's review was *de novo* because the underlying proceeding was equitable in nature. We shall also review *de novo.* ORS 19.125(4). ·

[2] As we shall further explain *post, Hay* held that, by virtue of the common-law doctrine of "custom," the public was entitled to make recreational use of the "dry-sand" area of Oregon's beaches between mean high tide and the upland permanent vegetation line. *State ex rel Thornton v. Hay,* 254 Or 584, 462 P2d 671 (1969).

Oregon intervened to assert a public right to use the "dry-sand area" of Little Whale Cove and to enjoin defendants from interfering with that public right.[3]

### 2. *Little Whale Cove*

Little Whale Cove — we call it a "cove" because that is its geographic name, not because it necessarily fits any traditional definition of such a body of water[4] — is a small, somewhat unique body of water located at the Pacific Ocean south of the city of Depoe Bay.[5] The mouth of the cove lies on its west side between two rocky points directly to the north and south. The cove lies just east of a sloping rocky foreshore which rises from the ocean up to a rocky sill — also called a "bench" and a "dam" in the testimony — which then opens into the cove. The eastern half of the cove is bordered by a narrow beach. The narrow beach rises steeply from the water's edge to a berm which is about five feet above the surface of the cove. Behind the berm, the land slopes up to steep sandstone cliffs and upland vegetation. Two small freshwater streams flow into the pool from the east.

The rocky points and the sill at the westward edge of the cove are basalt. The sill is covered with marine organisms, including algae. The pool has a smooth, sandstone bottom which slopes upward to the narrow beach from a depth of about seven feet at the base of the sill. At its widest point, the pool is about 150 feet from the inside edge of the sill on the west to the narrow beach on the east.

The cove has a fan-shaped configuration that is characteristic of areas formed when waves enter through a relatively constricted opening and then spread out. The bottom of the cove is scoured clean in most places by wave action; in sheltered areas, the bottom is made up of sediment whose rippled texture is also consistent with wave action. The berm was formed by wave action. Waves periodically deposit kelp, seaweed, and even driftwood on the narrow beach and at the

---

[3] The trial court denied relief to both private parties. Their claims *inter se* are not before us.

[4] For example, the American Heritage Dictionary (2nd College Edition, 1982) defines "cove" as "a small, sheltered bay in the shoreline of a sea, river, or lake."

[5] A map of the general vicinity appears in the Appendix to this opinion.

base of the cliffs on either side of the pool, forming what the witnesses called a "strand line."

The narrow beach itself is composed of coarse grains of basaltic material and small snail shells, sea urchin spines, broken clam shells, and other debris from coastal animals. These materials are for the most part washed onto the narrow beach from the ocean.

Mean high tide lies seaward of the cove's mouth on the downward slope of the rocky foreshore, roughly 50 feet from the inner (eastern) edge of the sill and 3.1 feet below it. Tides alone rarely (if ever) rise to a level above the sill; sea water only enters the cove through wave action. Ocean waves do not reach the interior of the cove at low tides, but will enter it sporadically at higher tides, depending on how high the waves are.

The two streams at the east end of the cove continuously flow into the pool, keeping the water level at the lip of (and spilling over) the sill. The result is a stratification of the water in the pool, with the lighter fresh water lying on the surface of the pool and the heavier salt water, periodically deposited by waves, settling on the bottom. During storms or extreme high tides, the entire pool may be inundated by waves, pushing most of or all the freshwater out to sea. When this happens, it takes at least a week for the stratification of fresh water over salt water to reappear in the pool.

A variety of plants and animals inhabit the cove. The craggy sill is covered with red and green algae, intermixed with small intertidal organisms such as snails. Inside the pool live marine snails, mussels, hermit crabs, and shore crabs. These are marine organisms. Although resistant to fresh water in varying degrees, they cannot survive continuous exposure to it.

A vegetation line is visible on the upper, easternmost boundary of the narrow beach above the cove. Experts at trial characterized this "upland" vegetation as typical of coastal areas in the Pacific Northwest. The vegetation nearest the narrow beach consists primarily of silverweed, which is a perennial plant that becomes dormant in late fall or winter, although its extensive root system survives and sends up new shoots in the spring. During winter or when exposed to ocean

waves, the tops of silverweed turn brown. Landward from the narrow beach, the silverweed becomes mixed with other upland species of vegetation including sea rocket, grasses and sedges, thistle, Queen Anne's lace, and horsetails. Between the visible line of vegetation and seaward to the mean high tide line, there is no vegetation of any other freshwater upland species.

The question is — what is Little Whale Cove? Is it part of the Pacific Ocean? If not, what is it? On this question, the experts disagree.

The state's expert witness, Dr. Jefferson Gonor, believed that the cove was a large intertidal pool that was subjected to wave action often enough to maintain what he described as "a well-formed typical beach profile, typical of ocean waves." He could not say, however, how often waves actually entered the cove. Asked to categorize the cove, he had some difficulty:

"Q [COUNSEL FOR THE STATE]   Did you consider Little Whale Cove to be a tide pool?

"A [GONOR]   It is — that would be the closest thing that I could compare it to or describe it as. It's a high intertidal pool, a very large one. So large that a beach builds up, a small area beach builds up at the back shore area. That's how I would compare it. I don't know of anything else like it, so it's — it doesn't — it defies classification because it's unique, in my view.

"Q   Would you classify it as a freshwater pool?

"A   No, sir, I would not because it has marine organisms in it.

"Q   Would you characterize it or classify it as rocky headland?

"* * * * *

"A   This part of the cove I would not characterize as a rocky headland. I would — if you use the word 'cove,' and would say that this is a cove."

Defendants' expert, Dr. Richard S. Caldwell, an environmental consultant, had a different view. He had visited Little Whale Cove to try to determine what kinds of marine life were to be found on the sill, and what the makeup of the pool behind the sill was.

Caldwell testified that there are various tidal zones, from those just beneath the lowest tides to those above the highest tides. These are called the sublittoral (below the low tide line, *i.e.,* in the ocean), the eulittoral (between low and high tide, *i.e.,* subject to daily tide action), supralittoral fringe (above normal high tide but still subject to tidal influence), and supralittoral (no tidal exposure except perhaps during heavy storms). Of these, he could identify all but the supralittoral on the westerly, rocky foreshore of Little Whale Cove. The top of the sill he classified as "supralittoral fringe," based on its flora and fauna and particularly on the presence of enteromorpha intestinalis, an algae which normally requires some fresh water influence to thrive. Caldwell concluded that the pool should be considered akin to an estuary, rather than to the usual supralittoral pool:

> "[CALDWELL]    All of those are species [of crustaceans that he had identified as living in the pool] that are not characteristically found on the open coast. In fact, they're fairly common species in estuarian areas in Oregon.
>
> "Q [BY COUNSEL FOR DEFENDANTS]    Meaning what?
>
> "* * * * *
>
> "A    Meaning, to me, that the environment is more like — if you will — an estuary than an intertidal open coast area, and that's because of the freshwater influence, which is characteristic of high rock pools that have some source of fresh water."

Caldwell also testified about the salinity, temperature, and dissolved oxygen profile of the cove, based on a sample he had taken at the eastern edge of the sill. The upper two feet of water were nearly fresh. The next two feet exhibited increasing salinity. The bottom layer, from four feet down, had a constant salinity value near that of sea water. The fresh water is found on top, he explained, because it is less dense. This profile is consistent with infrequent tidal intrusion.

The temperature profile — the pool was warmer at the bottom than at the top — was also consistent with infrequent tidal intrusion. The warming at the bottom was due to the fact that sunlight, passing through the relatively clear top layer of fresh water, was able to strike the bottom of the pool and warm the water just above it. The heavier, more dense salt

water retained much of the heat, rather than passing it through to the fresh water layer.

The oxygen profile was consistent with the other two factors. The bottom layer was supersaturated with oxygen, indicating no recent contact with surface air. Considering these three profiles of the pond, together with the types of organisms he had found in it, Caldwell concluded that the pond was not influenced by any regular tidal action.

Caldwell acknowledged that the layering he found in the pool could be disrupted by a storm, and that it would probably take longer than a week to reestablish the pattern he had found, although he could not state with any precision how long it would take. The biological characteristics, however, indicated that the pond is stable and that fresh water is present a great deal of the time.

The trial judge announced his decision this way:

"[The state] rests its case upon the doctrine of custom as announced in the case of *State, ex rel Thornton v. Hay* * * *. The short answer to the State's contention is that there is no, quote, 'dry sand' area abutting mean high tide and Little Whale Cove.

"* * * * *

"I conclude that the pool situated landward of the basaltic barrier is not part of the ocean. It is a fresh-water pool occasionally influenced by the Pacific Ocean. The dry sand area is a beach abutting the pool situated entirely on private land. The beach is not dry sand area along the Pacific shore open to the public for recreational use. The [defendants] are entitled to a decree against the State on that issue."

### 3. Decision of the Court of Appeals

The Court of Appeals discounted the significance of the facts.[6] All that mattered, that court held, was that the cove

---

[6] In a footnote, the court said:

"Although it is only legally necessary to prove that Little Whale Cove is a part of the ocean shore between the mean high tide line and the visible line of upland vegetation in order for it to contain 'dry-sand area,' the trial court's finding that the cove is not 'part of the ocean' and does not contain 'dry-sand area' along the Pacific shore is without support, given the uncontroverted evidence of the cove's marine characteristics."

*McDonald v. Halvorson*, 92 Or App 478, 485 n 5, 760 P2d 263 (1988). As our recitation of the facts indicates, the trial court's conclusion — the view of the Court of Appeals notwithstanding — has significant support in the evidence.

lay between mean high tide line and the visible line of vegetation:

"The tidal pool and the beach at Little Whale Cove lie between the mean high tide line and the visible upland vegetation. Therefore, we hold that Little Whale Cove contains 'dry-sand area' within the meaning of *Thornton v. Hay, supra,* which is subject to the public's right of recreational use as a matter of law.

"Defendants argue, and the trial court found, that, because the beach in this case does not 'abut' mean high tide, but is separated from mean high tide by a basaltic sill and a tidal pool, *Thornton v. Hay, supra,* does not apply. Defendants contend that, because Little Whale Cove's unique geographic characteristics 'separate' its beach from mean high tide, it is not subject to the public's right of use. That is the sort of tract-by-tract analysis that the Supreme Court sought to avoid. The court employed the term 'dry-sand area' to designate that part of the ocean shore between the mean high tide line and the visible upland vegetation line (also known as the backshore). It did not limit its ruling literally to dry sand. 254 Or at 595.

"Whether a particular parcel of the coast is made of fine sand, coarse pebbles or solid rock is irrelevant to a determination whether it is 'dry-sand area.' Similarly, the frequency with which a beach is washed by ocean waves is of no consequence, if the beach lies between the lines of mean high tide and visible vegetation. If that were not so, the public's use of Oregon's beaches would depend upon complex presentations of biological, botanical and geomorphological data specific to each and every beach, cove and inlet on the coast. The result, inevitably, would be a patchwork quilt of coastal lands, some subject to public use and others not, with no clear means available to the using public to tell which is which. The proper question for the trial court was whether the beach at Little Whale Cove is situated between the lines of mean high tide and visible vegetation. The evidence shows that this beach is so situated."

*McDonald v. Halvorson, supra,* 92 Or App at 485-86 (footnotes omitted).

4. *Public Use of Ocean Beaches — State ex rel Thornton v. Hay*

The state claims a public right to the dry-sand area of Little Whale Cove on the strength of this court's decision in

*State ex rel Thornton v. Hay, supra.* That case began as an action on behalf of the state to enjoin the defendants Hay, who were owners of a tourist facility at Cannon Beach, from fencing off a section of the dry sand beach between their facility and the ocean. The Hays intended to reserve that portion of the beach for their paying guests. A trial court granted the state's requested injunction. The Hays appealed to this court.

On appeal, the state argued two theories: (1) the public had acquired an easement by prescription over the subject beach; and (2) the state had the right, by virtue of zoning controls contained in a recently enacted portion of the Oregon Beach Bill, ORS 390.640,[7] to prevent any construction of any structure on the beach between mean high tide and the upland 16-foot contour line. This court affirmed the decision of the trial court, but on a theory slightly different from those argued to it — it found that the public had acquired a right to use the dry-sand beaches of the state for recreational use by virtue of the ancient common-law doctrine of "custom."

The court first identified the area it was addressing, *viz.,* the "dry-sand area," as being "assumed to be the land lying between the line of mean high tide and the visible line of vegetation." *State ex rel Thornton v. Hay, supra,* 254 Or at 586 (footnote omitted). The "vegetation line" was identified as "the seaward edge of vegetation where the upland supports vegetation. It falls generally in the vicinity of the sixteen-foot-elevation contour line, but is not at all points necessarily identical with that line." *Id.* The court explained the relevance of the dry-sand area as follows:

> "The dry-sand area in Oregon has been enjoyed by the general public as a recreational adjunct of the wet-sand or foreshore area since the beginning of the state's political history. The first European settlers on these shores found the aboriginal inhabitants using the foreshore for clam digging and the dry-sand area for their cooking fires. The newcomers continued these customs after statehood. Thus, from the time of the earliest settlement to the present day, the general public has assumed that the dry-sand area was a part of the public beach, and the public has used the dry-sand area for picnics,

---

[7] For a discussion of the relationship of the 1967 and 1969 Beach Bills to this litigation, see part 5(a) of this opinion, *post* at p 15 *et seq.*

gathering wood, building warming fires, and generally as a headquarters from which to supervise children or to range out over the foreshore as the tides advance and recede. * * *

"Perhaps one explanation for the evolution of the custom of the public to use the dry-sand area for recreational purposes is that the area could not be used conveniently by its owners for any other purpose. The dry-sand area is unstable in its seaward boundaries, unsafe during winter storms, and for the most part unfit for the construction of permanent structures. While the vegetation line remains relatively fixed, the western edge of the dry-sand area is subject to dramatic moves eastward or westward in response to erosion and accretion."

*Id.* at 588-89.

The public's general assumption that it had an interest in the dry-sand areas of the coast had some foundation in law before 1935. As this court went on to explain:

"The public's assumption that the dry sand as well as the foreshore was 'public property' had been reinforced by early judicial decisions. * * * These cases held that landowners claiming under federal patents owned seaward only to the 'high-water' line, a line that was then assumed to be the [permanent] vegetation line [inland from the water's edge].

"In 1935, the United States Supreme Court held that a federal patent conveyed title to land farther seaward, to the mean high-tide line. * * * While this decision may have extended seaward the record ownership of upland landowners, it was apparently little noticed by Oregonians. In any event, [that] * * * decision had no discernible effect on the actual practices of Oregon beachgoers and upland property owners.

"* * * * *

"The disputed [dry-sand] area is *sui generis*. While the foreshore is 'owned' by the state, and the upland is 'owned' by the patentee or record-title holder, neither can be said to 'own' the full bundle of rights normally connoted by the term 'estate in fee simple.' "

*Id.* at 589-90, 91-92 (footnote and citations omitted).

This discussion of the history of public use of the dry-sand area led directly into a review of the common-law doctrine that this court found to be most applicable to such a situation, *viz.* the doctrine of "custom":

"Because many elements of prescription are present in

this case, the state has relied upon [that] doctrine in support of the decree below. We believe, however, that there is a better legal basis for affirming the decree. The most cogent basis for the decision in this case is the English doctrine of custom. Strictly construed, [the doctrine of] prescription [relied upon by the state] applies only to a specific tract of land before the court, and doubtful prescription cases could fill the courts for years with tract-by-tract litigation. An established custom, on the other hand, can be proven with reference to a larger region. Ocean-front lands from the northern to the southern border of the state ought to be treated uniformly.

"The other reason which commends the doctrine of custom over that of prescription as the principal basis for the decision in this case is the unique nature of the lands in question. This case deals solely with the dry-sand area along the Pacific shore, and this land has been used by the public as public recreational land according to an unbroken custom running back in time as long as the land has been inhabited."

*Id.* at 595.[8]

The court then explained the origin of the doctrine in the common law and recited its seven traditional elements: (1) an ancient practice; (2) exercised without interruption; (3) peaceable and free from dispute during its long exercise; (4) reasonableness in use; (5) applied to a clearly defined area; (6) obligatory on all landowners; and (7) not repugnant with other customs or other law. The court found on the facts established in the case that each of the seven elements had been met. *State ex rel Thornton v. Hay, supra,* 254 Or at 594-96. The court concluded,

"[b]ecause so much of our law is the product of legislation, we sometimes lose sight of the importance of custom as a source of law in our society. It seems particularly appropriate in the case at bar to look to an ancient and accepted custom in this state as the source of a rule of law. The rule in this case, based upon custom, is salutary in confirming a public right, and at the same time it takes from no man anything which he has had a legitimate reason to regard as exclusively his."

*Id.* at 599.

---

[8] *See also State Highway v. Fultz,* 261 Or 289, 292, 491 P2d 1171 (1972).

## 5. Analysis

The state, in its argument before this court, essentially adopts the reasoning of the Court of Appeals. It does not matter, the state argues, whether the land between mean high tide and the visible vegetation line is sand, dirt, boulders, or stone cliffs and headlands. Whatever it actually is, all such land is *legally* "dry-sand area" and subject to recreational use by the public under *Hay*. Both the Court of Appeals and the state misread that precedent.

Before discussing the factual and legal reasons that lead us to conclude that the Court of Appeals erred in this case, we think it is important to explain why the legislature's two entries in this arena — the 1967 and 1969 Oregon Beach Bills — are not pertinent to our decision.

### (a.) Inapplicability of Beach Bills

The 1967 Oregon legislature took a major step in preserving the public's access to and use of the Oregon beaches when it enacted the first Oregon Beach Bill, Or Laws 1967, ch 601. The purposes of the measure were expressed in sections 1, and 2(1) and (2) (codified as ORS 390.610(1), (2) and (3) (1967)):

> "(1)   The Legislative Assembly hereby declares it is the public policy of the State of Oregon to forever preserve and maintain the sovereignty of the state heretofore existing over the seashore and ocean beaches of the state from the Columbia River on the North to the Oregon-California line on the South so that the public may have the free and uninterrupted use thereof.

> "(2)   The Legislative Assembly recognizes that over the years the public has made frequent and uninterrupted use of lands abutting, adjacent and contiguous to the public highways and state recreation areas and recognizes, further, that where such use has been sufficient to create easements in the public through dedication, prescription, grant or otherwise, that it is in the public interest to protect and preserve such public easements as a permanent part of Oregon's recreational resources.

> "(3)   Accordingly, the Legislative Assembly hereby declares that all public rights and easements in those lands described in subsection (2) of this section are confirmed and declared vested exclusively in the State of Oregon * * *."

Section 5 of the same measure went on to provide that, in order to protect the public's interest in the areas described in ORS 390.610,

"no person shall, except as provided in [a construction permit system provided in section 6 of the Act, codified as] ORS 390.650, erect, make or place any appurtenance, structure or improvement on any property that is within the area along the Pacific Ocean located between the extreme low tide and the elevation of 16 feet following natural topographic contour lines."

Thus, the legislature had created a restrictive zoning provision designed to keep abutting land owners from building anything that would interfere with the public's enjoyment of the ocean beaches. *See State Highway v. Fultz,* 261 Or 289, 491 P2d 1171 (1972). The legislature apparently considered the 16-foot elevation line to roughly correspond to the permanent vegetation line east of the Pacific shore. The legislature recognized, however, that the 16-foot elevation line designation might not prove satisfactory. It therefore directed the State Highway Commission to survey Oregon's Pacific shoreline and to report back to the next legislative session. Or Laws 1967, ch 601, § 11.

The State Highway Commission did report back with a survey, which the Legislative Assembly then enacted into law. Or Laws 1969, ch 601, § 8 (codified as ORS 390.770); Or Laws 1969, ch 601, § 2. The legislature also amended ORS 390.610(1), (2) and (3) to their present form (deleted language is shown in brackets; added language is in italic):

"(1)   The Legislative Assembly hereby declares it is the public policy of the State of Oregon to forever preserve and maintain the sovereignty of the state heretofore *legally* existing over the [seashore and] ocean [beaches] *shore* of the state from the Columbia River on the North to the Oregon-California line on the south so that the public may have the free and uninterrupted use thereof.

"(2)   The Legislative Assembly recognizes that over the years the public has made frequent and uninterrupted use of *the ocean shore* [lands abutting, adjacent and contiguous to the public highways and state recreation areas] and recognizes, further, that where such use has been *legally* sufficient to create *rights or* easements in the public through dedication,

prescription, grant or otherwise, that it is in the public interest to protect and preserve such public *rights or* easements as a permanent part of Oregon's recreational resources.

"(3)  Accordingly, the Legislative Assembly hereby declares that all public rights [and] *or* easements *legally acquired* in those lands described in subsection (2) of this section are confirmed and declared vested exclusively in the State of Oregon * * *."

Or Laws 1969, ch 601, § 4. Finally, the legislature also amended *former* ORS 390.710(2)(recodified as ORS 390.605(2)) to provide the following definition of "ocean shore":

" 'Ocean shore' means the land lying between extreme low tide of the Pacific Ocean and the line of vegetation as established and described by ORS 390.770."

Nothing in either the 1967 or the 1969 measure suggests that the legislature intended, by its enactment, to acquire for the state any interest not already vested in the public. Similarly, nothing in either measure fairly could be said to indicate any intention on the part of the legislature to waive or surrender any right the public might have acquired in areas not specifically covered by the metes and bounds description found in ORS 390.770. The effect of the 1969 amendments simply was to clarify the intended scope of the earlier Beach Bill and to provide specific coordinates that the legislature believed would approximate the permanent vegetation line for zoning purposes.[9]

In the present case, however, defendants at one point in their pleadings alleged as an affirmative defense to the state's assertion of a public interest in Little Whale Cove that

---

[9] The line is subject to adjustment. ORS 390.755 provides:

"(1)  The Parks and Recreation Division is directed to periodically reexamine the line of vegetation as established and described by ORS 390.770 for the purpose of obtaining information and material suitable for a re-evaluation and re-definition, if necessary, of such line so that the private and public rights and interest in the ocean shore shall be preserved.

"(2)  The Department of Transportation may, from time to time, recommend to the Legislative Assembly adjustment of the line described in ORS 390.770."

This provision was also added to Oregon law by Or Laws 1969, ch 601, § 27. It has since been amended only once, in 1979, to substitute the Parks and Recreation Division for the State Highway Engineer. Or Laws 1979, ch 186, § 24.

the cove did not lie within the metes and bounds set out in ORS 390.770:

> "ORS 390.605, *et seq.*, (hereinafter the 'Oregon Beach Bill'), enacted in 1967 and amended in 1969, reserves designated areas of the ocean shore for public recreational use. Little Whale Cove is not designated for public use under the Oregon Beach Bill and therefore is not subject to the public recreational rights herein asserted."

Defendants' Amended Answer to Intervenor's First Amended Complaint, first affirmative defense, paragraph 14.

The state responded by moving for summary judgment as to this affirmative defense. In essence, it argued that the source of the public's right to Little Whale Cove (if there was such a right) arose not out of the Beach Bill but out of the common law and *State ex rel Thornton v. Hay, supra.* The state noted,

> "The State is willing to stipulate that some portion of Little Whale Cove is located landward of the statutory vegetation line [*i.e.*, to the east of the line established by ORS 390.770].
>
> "* * * * *
>
> "* * * [But] the State [does seek] * * * a judgment that the Beach Bill, does not, by its statutory vegetation line, extinguish common law public rights existing up to the actual vegetation line in *any location* on the Oregon Coast where there is a discrepancy between the two lines."

Intervenor's Memorandum of Law in Support of Motion for Partial Summary Judgment 13 n 6 (emphasis added).

The trial court granted the state's motion for summary judgment as to this issue. The case was therefore tried without reference to the Beach Bill, on the assumption that the bill did not, by its terms, purport to govern Little Whale Cove. Having no independent way of verifying the geographic assumptions involved, we assume (as, apparently, did the trial court and the parties) that the Beach Bill is not pertinent to our decision in this case.[10] We return to consideration of those factual and legal questions that are pertinent.

---

[10] While the 1969 Beach Bill was in effect by the time this court announced its decision in *State ex rel Thornton v. Hay, supra,* that opinion referred only to the 1967 Act. *Id.* at 590-91.

### (b.) Factual Distinctions

■    Our view of the facts makes it unnecessary to decide whether the situation is as simple in all cases involving land between the ocean's mean high tide and the visible line of upland vegetation as the Court of Appeals believed it to be. We take as a point of departure that the court in *Hay* necessarily meant, when it used the phrase, "mean high tide," that the dry-sand area actually was adjacent to an *ocean*. The entire opinion clearly assumes such to be the case, and does not claim any public right by virtue of custom for any dry-sand area situated somewhere else. This assumption underlying *State ex rel Thornton v. Hay* is critical, because the record persuades us that Little Whale Cove is not a part of the ocean and, therefore, the narrow beach east of it is not a part of the "dry-sand area along the Pacific shore" to which the court referred.

Our conclusion is based primarily on our acceptance of Caldwell's testimony as being the more definitive and persuasive. Like the trial judge, we are persuaded by the pond's profiles in animal and plant life, salinity, oxygen, and temperature that it is not an intertidal pool. It is a uniquely located freshwater pool formed at the coast where a basalt dam prevents two freshwater streams from discharging directly into the ocean.

Because Little Whale Cove is not a part of the ocean, the location of its beach is not congruent with the *Hay* court's assumption that it was speaking of beaches that bordered on the ocean. This beach, although near the ocean, does not border on it. *Hay* does not by its terms support the state in this case.

### (c.) Legal Distinctions

The state's alternative theory (and that of the Court of Appeals) is that the precise location of the beach, whether bordering on the ocean or only nearby, is not the point. *Hay*, it is argued, did not make such distinctions.

Although much has been written, both in criticism

and in praise, about the *Hay* case since it was announced,[11] no decision of this court since *Hay* has elaborated on it. The decision certainly has something in it for everybody. It has, for example, expansive language that gives comfort to the analysis of the Court of Appeals and the argument of the state. When the court indicated that it wished to avoid any need for "tract-by-tract litigation," or said that "[o]cean-front lands from the northern to the southern border of the state ought to be treated uniformly," it was speaking in sweeping terms as to the potential scope of its decision.

But the court made other statements suggesting that its decision had a more narrow focus. Its frequent reiteration of the phrase, "dry-sand area," for example, suggests at the very least that the court's attention was focused only on those coastal areas characterized by that substance rather than cliffs or rocky headlands. Its discussion of the elements of custom noted that the beach at Cannon Beach had been used "uniformly with *similarly situated* lands elsewhere." *Id.* at 597 (emphasis supplied). Moreover, the court noted at the end of its opinion,

> "The rule in this case, based upon custom, is salutary in confirming a public right, *and at the same time it takes from no man anything which he has had a legitimate reason to regard as exclusively his.*"

*Id.* at 599 (emphasis added). All these statements suggest that the court was speaking only about those coastal areas that had histories of use like the Cannon Beach area.

Finally, the court recognized that there could be circumstances in which declaring the right of the public to use private property for recreation could constitute a taking of that property — something the court apparently did not intend to do or believe it was doing in *Hay. Id.* at 591, 599; Or Const, Art I, § 18; *see also Nollan v. California Coastal Commission,* 483 US 825, 107 S Ct 3141, 97 L Ed 2d 677 (1987).

Although these various sets of statements in *Hay*

---

[11] *See, e.g.,* McLennan, *Public Patrimony: An Appraisal of Legislation and Common Law Protecting Recreational Values in Oregon State-Owned Lands and Waters,* 4 Envtl L 317 (1974); Delo, *The English Doctrine of Custom in Oregon Property Law:* State ex rel Thornton v. Hay, 4 Envtl L 383 (1974); *Note, Public Access to Beaches,* 22 Stan L Rev 564 (1970).

appear to be somewhat inconsistent, we do not think they are inconsistent. The court at all times had before it a record made with respect to a particular beach and a particular area on the northern Oregon coast. At the same time, the court and the parties were aware that the practice at Cannon Beach was representative of the practice at many beaches up and down the coast. If prescription were to be the theory upon which *Hay* was decided, the court anticipated that the result would be a fight over every other beach in the state, with each upland owner claiming that *as to that owner's parcel* the elements of prescription had not been established, even if they had been shown concerning the parcels on either side of that particular owner. By relying instead on the somewhat broader doctrine of custom, the court reasonably anticipated that much litigation could be avoided.[12]

But nothing in *Hay* fairly can be read to have established beyond dispute a public claim by virtue of "custom" to the right to recreational use of the entire Oregon coast, no matter what the topography of a particular place. *Hay* might make it clear that the doctrine of custom would apply to places "similarly situated," but it has to have been obvious to the court and the parties that not all areas of the coast necessarily were "similarly situated."

We take as a first premise that, to be "similarly situated," a piece of land must abut the ocean. It need not, however, have a classic, dry-sand beach like that found at Cannon Beach. "Dry-sand area" as used in that case can apply equally to gravel beaches, beaches strewn with or even made up of boulders, and other areas adjacent to the foreshore which, like the beach in *Hay,* have long been used for recreational purposes by the general public. Most such locations will be well-known in their own area, thus obviating any need for litigation, the outcome of which would be a foregone conclusion. But there may also be areas to which the doctrine of custom is not applicable. It follows that the Court of Appeals erred in stating that the rule of *State ex rel Thornton v. Hay, supra,* applied indiscriminately to areas of "fine sand, coarse pebbles or solid rock." It applies to such areas if they abut the ocean and if their public use has been consistent with the doctrine of

---

[12] That hope was justified. This is the first such case since *Hay.* The decision brought relative peace to what was potentially at the time a very litigious situation.

custom as explained in *Hay*; otherwise, other rules of law will apply.

We do not retreat today from anything said in *Hay*. That case was well considered and decided, and we adhere to it. But Little Whale Cove is an area to which the rule of *Hay* does not apply. The evidence establishes that the cove has been in private hands since statehood and that for many years trespassers have been discouraged and even, on occasion, evicted. The only access to the cove is over private property or across a dangerous, uneven field of rocks on the foreshore of the headland immediately to the north of the property. The narrow beach on the eastern bank of the cove does not abut the ocean. There is no testimony in this record showing customary use of the narrow beach on the bank of the cove. The unique physical geography of the cove and its banks (separated as they are from the ocean's tidal limits by both the basalt sill and distance) does not suggest any likelihood of consistent utilization by ancient inhabitants. The doctrine of custom announced in *Hay* simply does not apply to this controversy. The public has no right to recreational use of the narrow beach at Little Whale Cove by virtue of the doctrine of custom, because there is no factual predicate for application of the doctrine. The Court of Appeals erred in concluding otherwise.

The decision of the Court of Appeals is reversed. The judgment of the trial court is affirmed.