Argued and submitted March 3, decision of the Court of Appeals and judgment of the circuit court affirmed July 1, 1993

Irving C. and Jeanette STEVENS,
*Petitioners on Review,*

*v.*

CITY OF CANNON BEACH
and State of Oregon,
Department of Parks & Recreation,
*Respondents on Review.*

(CC 90-2061; CA A68916; SC S39585)

854 P2d 449

Garry P. McMurry, of Garry P. McMurry & Associates, Portland, argued the cause and filed the petition for petitioners on review.

Michael D. Reynolds, Assistant Attorney General, Salem, argued the cause for respondent on review State of Oregon, Department of Parks and Recreation. With him on the response were Theodore R. Kulongoski, Attorney General, and Virginia L. Linder, Solicitor General. With Jack L. Landau, Deputy Attorney General, on a response were Charles S. Crookham, Attorney General, and Virginia L. Linder, Solicitor General, Salem.

No appearance for respondent on review City of Cannon Beach.

Keith A. Bartholomew, Portland, filed a brief for *amici curiae* 1000 Friends of Oregon, League of Women Voters of Oregon, and Oregon Shores Conservation Coalition.

VAN HOOMISSEN, J.

## VAN HOOMISSEN, J.

Plaintiffs appeal a trial court's judgment dismissing their complaint for inverse condemnation for failure to state a claim. ORCP 21A(8). Plaintiffs own two vacant lots in the dry sand area of the City of Cannon Beach (city).[1] They applied to defendants city and Oregon Department of Parks and Recreation (department) for permits to build a seawall as part of the eventual development of the lots for motel or hotel use. City and department denied the application on a number of grounds.

Plaintiffs then brought this inverse condemnation action, alleging that defendants' denials, and the ordinances and rules on which they were based, resulted in a taking of plaintiffs' property, in violation of Article I, section 18, of the Oregon Constitution, and the Fifth Amendment of the United States Constitution. Defendants moved to dismiss plaintiffs' complaint, pursuant to ORCP 21A(8). Relying on *State ex rel Thornton v. Hay*, 254 Or 584, 462 P2d 671 (1969) (*Thornton*), the trial court allowed defendants' motions. The Court of Appeals affirmed. *Stevens v. City of Cannon Beach*, 114 Or App 457, 835 P2d 940 (1992). For the reasons that follow, we affirm the decision of the Court of Appeals.

Plaintiffs are the owners of two vacant ocean front lots in Cannon Beach, which have been improved by construction of streets and provision of utilities. Although the lots are zoned for residential or motel use, parts of them are subject to city's Active Dune and Beach Overlay zone. That zoning implements a portion of the Land Conservation and Development Commission's (LCDC) Statewide Goal 18, which limits "residential developments and commercial and industrial buildings on beaches, and on active foredunes, and other foredunes which are conditionally stable and that are subject to ocean undercutting or wave overtopping." Zoning Ordinance of Cannon Beach 79-4A, § 3.180. Parts of plaintiffs' lots also are within the dry sand area of the beach, as defined by

---

[1] For the purposes of this case, we will refer to the land below the ordinary high tide line as the "wet sand area" and the land above the ordinary high tide line but below the vegetation line as the "dry sand area." The disputed land at issue in this case is dry sand area.

the Oregon Beach Bill (Beach Bill). ORS 390.605 *et seq.*[2] Any person who wants to make an improvement on any property subject to ORS 390.640 must obtain a permit from the department. ORS 390.650.

Plaintiffs applied to city for a conditional use permit to build the seawall. City denied plaintiffs' application, in part because city found that the eventual proposed commercial use of the property conflicted with LCDC Goal 18.[3] Plaintiffs also applied to department for a permit to build the seawall within the dry sand area of the beach. ORS 390.650. That permit also was denied.[4]

---

[2] ORS 390.605 provides in part:

"As used in ORS 390.610 * * *:

"* * * * *

"(2) 'Ocean shore' means the land lying between extreme low tide of the Pacific Ocean and the line of vegetation as established and described in ORS 390.770."

ORS 390.615 provides:

"Ownership of the shore of the Pacific Ocean between ordinary high tide and extreme low tide, and from the Oregon and Washington state line on the north to the Oregon and California state line on the south, excepting such portions as may have been disposed of by the state prior to July 5, 1947, is vested in the State of Oregon, and is declared to be a state recreation area. No portion of such ocean shore shall be alienated by any of the agencies of the state except as provided by law."

[3] Plaintiffs' application to city also failed to satisfy a number of criteria for a conditional use permit. City's findings of fact state: that the design of the proposed seawall was not based on findings of a geologic site investigation, as required by city's comprehensive plan; that the proposed seawall conflicted with Flood Hazard Policy 3, because the calculated 100-year velocity flood would overtop the proposed seawall by 4.9 feet, which could result in damage to structures located behind the seawall; and that plaintiffs had failed to demonstrate that other higher-priority methods of erosion control (such as maintenance or planting of vegetation) would not be effective to stabilize the shoreline and that therefore the seawall (the lowest priority stabilization method) was required.

[4] Plaintiffs' application to department also failed to satisfy a number of criteria for a permit. Department's findings of fact state: that plaintiffs had not demonstrated erosion in the area that required a new seawall; that they had not demonstrated the need for new motel units in the city; that they had failed to obtain the permit required by ORS 196.810 for fill removal; that the proposed seawall would obstruct the view; that the seawall would remove 12,500 feet of dry sand area used extensively for public recreation; that recreational access would be impaired; that the seawall would present an escape route obstacle to beach users (particularly to senior citizens and others whose mobility is impaired); that neighboring property and land in front of the seawall could be subject to accelerated erosion; and that the proposed design did not protect on-shore property from wave overtopping and the 100-year flood.

Plaintiffs then brought this inverse condemnation action against defendants, alleging that city's denial of a permit is a taking of private property for a public purpose, in violation of Article I, section 18,[5] and the Fifth Amendment (an "as applied" taking), and that city's Zoning Ordinance 79-4A, implementing LCDC Goal 18, on its face, is an unconstitutional taking of private property for a public purpose ("facial" taking).[6]

Plaintiffs further alleged that department's denial of a permit is an unconstitutional "as applied" taking of their property and that department's rules implementing LCDC Goal 18 are an unconstitutional "facial" taking. Plaintiffs also claimed that compliance with other technical requirements for the proposed seawall could not result in the award of the permits and that, therefore, they had pursued all available means of relief with defendants.

Defendants filed ORCP 21A(8) motions to dismiss against plaintiffs' complaint, arguing that plaintiffs' takings allegations failed to state ultimate facts sufficient to constitute claims. The trial court granted defendants' motions with prejudice, citing *Thornton, supra*. The court explained that defendants' denials took nothing from plaintiffs, because plaintiffs' property interests in the lots never have included development rights that could interfere with the public's use of the dry sand area.[7] Accordingly, the court entered judgment for defendants.

In the Court of Appeals, plaintiffs argued that the trial court erred in holding that *Thornton* precluded any development of the dry sand area of their property. The Court

---

[5] Because plaintiffs have not made a separate argument under the state constitution, we will assume for purposes of this case, without deciding, that the analysis would be the same under the Oregon Constitution. *See Dept. of Trans. v. Lundberg*, 312 Or 568, 572, 572 n 4, 825 P2d 641 (1992) (stating principle).

[6] *See* Annot, *Supreme Court's View As To What Constitutes "Taking" Within Meaning of Fifth Amendment's Prohibition Against Taking of Private Property For Public Use Without Just Compensation*, 89 L Ed 2d 977 (1988).

[7] Plaintiffs then voluntarily dismissed without prejudice a final claim for *de novo* review of department's denial of the permit. ORS 390.658 provides in part:

"Any person aggrieved by the decision of the State Parks and Recreation Department under ORS 390.650 is entitled to petition the circuit court of the county where the property is located for a judicial review, de novo as in equity, of the action or failure to act by the department."

of Appeals disagreed and affirmed, quoting *Thornton*:

> " 'The disputed area [dry sand area] is *sui generis*. While the foreshore is "owned" by the state, and the upland is "owned" by the patentee or record title holder, neither can be said to "own" the full bundle of rights normally connoted by the term "estate in fee simple." * * *
>
> " '* * * * *
>
> " 'The rule in this case, based upon custom, is salutary in confirming a public right, and at the same time it takes from no man anything which he has had a legitimate reason to regard as exclusively his.' 254 Or at 591, 599." *Stevens v. City of Cannon Beach, supra*, 114 Or App at 459-60.

The court also noted that the recent decision of the Supreme Court of the United States in *Lucas v. South Carolina Coastal Council*, 505 US ___, 112 S Ct 2886, 120 L Ed 2d 798 (1992) (*Lucas*), did not require a different result. *Ibid.* Accordingly, the court concluded that the trial court did not err in dismissing plaintiffs' taking claims.

■ On review,[8] plaintiffs argue that the Court of Appeals' decision in this case conflicts with the recent decision of the Supreme Court of the United States in *Lucas v. South Carolina Coastal Council, supra*. Plaintiffs further argue that, because they acquired their property before this court's 1969 decision in *Thornton*, the rule from *Thornton* may not be applied retroactively to them.[9] Finally, plaintiffs argue that the trial court and the Court of Appeals incorrectly interpreted *Thornton* as having superseded and canceled *all* development rights of private owners on the dry sand area of city, thus impliedly repealing the provisions of the Beach Bill that allow *some* development.[10] Plaintiffs do not ask this

---

[8] During oral argument in this court, plaintiffs asked this court to take judicial notice of three instances where, according to plaintiffs, dry sand areas within the state of Oregon have been developed. We decline to do so. Under the Oregon Evidence Code, a court may take judicial notice of an adjudicative fact if it is generally known within the jurisdiction or if it is "[c]apable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." OEC 201(b). Plaintiffs' proposed facts fit neither of those categories.

[9] The date of the *Thornton* decision is not relevant. Rather, the question is when, under *Thornton's* reasoning, *the public rights came into being*. The answer is that that they came into being long before plaintiffs acquired any interests in their land.

[10] Plaintiffs make several other assignments of error, most of which are subsumed by our framing of the main issue in this case. The others do not merit discussion.

court to overrule *Thornton*, and they do not argue that any portion of the Beach Bill is unconstitutional.

Defendants respond that, because *Lucas* holds that where the state seeks to sustain regulation that deprives land of all economically beneficial use, the state may resist compensation if the "proscribed use interests" were not part of the owner's title to begin with, *Lucas, supra*, 120 L Ed 2d at 820, *Lucas* comports with *Thornton*. Defendants argue that, because under the state property law doctrine of custom, the proscribed use interests in this case were not part of plaintiffs' title, there is no taking under *Lucas*.

Defendants further respond that, if the rule from *Thornton* could not be applied where the customary use by the public interfered with any economically beneficial uses by the dry sand area owners, *Thornton* would be severely limited. *Thornton*, defendants argue, did not create a new legal principle, but merely applied an existing legal principle of easement by custom grounded in Oregon's property law. Therefore, defendants argue, application of *Thornton* in the present case is not retroactive, any more than it was in *Thornton*. *See Hay v. Bruno*, 344 F Supp 286, 289 (D Or 1972) (rejecting argument that Oregon Supreme Court's decision in *Thornton* was a sudden change in state property law that therefore effected a taking of the property at issue in *Thornton*).

*Amici curiae* 1000 Friends of Oregon, the League of Women Voters of Oregon, and the Oregon Shores Conservation Coalition have submitted briefs on behalf of defendants, at both trial and appellate levels in this case. They argue that *Lucas* does not apply to the present case, because the regulations in question do not prevent "all economically beneficial use" of plaintiffs' property.[11]

---

[11] *Amici curiae* also set forth an interesting alternative analysis of this case, arguing that the public trust doctrine may provide a common-law source of protection of Oregon's beaches for use by the public. The public trust doctrine analysis, more in line with the specially concurring opinion of Justice Denecke in *Thornton*, has been followed in several jurisdictions. *See, e.g., Matthews v. Bay Head Imp. Assn*, 95 NJ 306, 471 A2d 355, *cert den* 469 US 821 (1984) (privately owned dry sand areas come under the umbrella of the public trust); *National Audubon Soc. v. Superior Court*, 33 Cal 3d 419, 189 Cal Rptr 346, 658 P2d 709, *cert den* 464 US 977 (1983) (landowners who purchase property subject to public trust do not state takings claims); *see also* Pitts, *The Public Trust Doctrine: A Tool for Ensuring Continued Public Use of Oregon Beaches*, 22 Envt'l

The parties recognize, and we agree, that *Thornton* is directly on point. The issue, therefore, is the viability of *Thornton's* rule of law in the light of *Lucas*. We therefore begin with a discussion of *Thornton*.

The facts in this case and in *Thornton* are remarkably similar. In each case, the landowners wished to enclose the dry sand area of their Cannon Beach properties, thereby excluding the public from that portion of the ocean shore. In *Thornton*, this court held that the state could prevent such enclosures because, throughout Oregon's history, the dry sand area customarily had been used by the public:

> "The dry-sand area in Oregon has been enjoyed by the general public as a recreational adjunct of the wet-sand or foreshore area since the beginning of the state's political history. The first European settlers on these shores found the aboriginal inhabitants using the foreshore for clam digging and the dry-sand area for their cooking fires. The newcomers continued these customs after statehood. Thus, from the time of the earliest settlement to the present day, the general public has assumed that the dry-sand area was a part of the public beach, and the public has used the dry-sand area for picnics, gathering wood, building warming fires, and generally as a headquarters from which to supervise children or to range out over the foreshore as the tides advance and recede. In the Cannon Beach vicinity, state and local officers have policed the dry sand, and municipal sanitary crews have attempted to keep the area reasonably free from man-made litter.

> "Perhaps one explanation for the evolution of the custom of the public to use the dry-sand area for recreational purposes is that the area could not be used conveniently by its owners for any other purpose. The dry-sand area is unstable in its seaward boundaries, unsafe during winter storms, and for the most part unfit for the construction of permanent structures." *Thornton, supra,* 254 Or at 588-89.

In *Thornton*, while noting that the common law of prescriptive easements also could apply, *id.* at 593-95, this court relied instead on the common-law doctrine of custom to support its holding that the landowners could be prevented

L 731 (1992). Because of our disposition of this case on other grounds, we do not reach this argument.

from excluding the public from the dry sand areas of the ocean shore:

> "The most cogent basis for the decision in this case is the English doctrine of custom. * * * An established custom * * * can be proven with reference to a larger region [than could a prescriptive easement]. * * *
>
> "The other reason which commends the doctrine of custom over that of prescription as the principal basis for the decision in this case is the unique nature of the lands in question. This case deals solely with the dry-sand area along the Pacific shore, and this land has been used by the public as public recreational land according to an unbroken custom running back in time as long as the land has been inhabited.
>
> "* * * * *
>
> "Finally, in support of custom, the record shows that the custom of the inhabitants of Oregon and of visitors in the state to use the dry sand as a public recreation area is so notorious that notice of the custom on the part of persons buying land along the shore must be presumed." *Thornton, supra,* 254 Or at 595, 598.

*See also McDonald v. Halvorson,* 308 Or 340, 780 P2d 714 (1989) (because no factual predicate shown for application of doctrine of custom, general public had no right to access or to use private inland dry sand area); *State Highway v. Fultz,* 261 Or 289, 491 P2d 1171 (1971) (public has used dry sand area between ordinary high tide and vegetation line for recreational purposes since 1889).

■ As defined in *Thornton,* the common-law doctrine of custom may be paraphrased as follows:

> (1) The land has been used in this manner so long "that the memory of man runneth not to the contrary";
>
> (2) without interruption;
>
> (3) peaceably;
>
> (4) the public use has been appropriate to the land and the usages of the community;
>
> (5) the boundary is certain;

(6) the custom is obligatory, *i.e.*, it is not left up to individual landowners as to whether they will recognize the public's right to access; and

(7) the custom is not repugnant or inconsistent with other customs or laws. *Thornton, supra*, 254 Or at 595-97, (citing Blackstone's Commentaries).

In *Thornton*, this court determined that the historic public use of the dry sand area of Cannon Beach met those requirements.[12] *Thornton, supra*, 254 Or at 596-97; 1 William Blackstone Commentaries 76-78 (1778). *See also McDonald v. Halvorsen, supra*, 308 Or at 359-60 (Oregon common-law doctrine of custom as stated in *Thornton* applies to classic dry

---

[12] There is no evidence that the native peoples recognized private ownership of the beach area at the time Europeans first appeared on the scene. Indeed, there was no sovereign who could have granted, enforced, or confirmed any private property rights in the beach areas for many years after the first Europeans arrived. The law of a common area, accessible and usable by all, called "custom," was itself a common part of the legal system accompanying European settlers into the Pacific Northwest. About 1819, the United States and Great Britain agreed to postpone for 20 years settlement of the question of which was sovereign in the Pacific Northwest. Settlement was made by treaty in 1846. *See* Merk, The Oregon Question (1967); Gallatin, The Oregon Question (1846); Twiss, The Oregon Question Examined (1846); Falconer, The Oregon Question (1845); Sturgis, The Oregon Question (1845). In the interim, various franchised private companies of Great Britain may have maintained order of sorts, but themselves provided no source of law. For a brief period, settlers in the Willamette Valley formed an independent government. The Oregon Territory was organized in 1848, and Oregon became a state in 1859.

The early Oregon cases relating to this subject indicate that "the tide lands lying between high- and low-water mark belong to the state." *Bowlby v. Shively*, 22 Or 410, 419, 30 P 154 (1892), *aff'd* 152 US 1, 14 S Ct 548, 38 L Ed 331 (1894), (citing *Parker v. Taylor*, 7 Or 446 (1879)). The Supreme Court's affirmance in that case stated:

"By the common law, both the title and the dominion of the sea * * * where the tide ebbs and flows, and of all the lands below high water mark, within the jurisdiction of the Crown of England, are in the King. Such waters, and the lands which they cover, either at all times, or at least when the tide is in, are incapable of ordinary and private occupation, cultivation and improvement; and their natural and primary uses are public in their nature * * *." *Shively v. Bowlby, supra*, 152 US at 11.

Although the early cases did not distinguish between dry sand and wet sand areas, this court has noted that the distinguishing line was considered to be "the 'high-water' line, a line that was then assumed to be the vegetation line." *Thornton, supra*, 254 Or at 589. It was not until 1935 that the United States Supreme Court redefined this boundary as extending to the mean high-tide line. *Borax Ltd. v. Los Angeles*, 296 US 10, 22-27, 56 S Ct 23, 80 L Ed 9 (1935). This court has noted that, although *Borax* "may have expanded seaward the record ownership of upland landowners, it was apparently little noticed by Oregonians * * * [and] had no discernible effect on the actual practices of Oregon beachgoers and upland property owners." *Thornton, supra*, 254 Or at 590.

sand areas abutting the ocean, such as Cannon Beach, but not to inland, freshwater cove with no history of customary use by public); Pitts, *The Public Trust Doctrine: A Tool for Ensuring Continued Public Use of Oregon Beaches*, 22 Envt'l L 731, 737 n 40 (1992) (noting other jurisdictions that have adopted the common-law doctrine of custom). We now turn to the determination of what effect the Supreme Court's opinion in *Lucas* has on Oregon's well-established policy of public access to and protection of its ocean shores, as articulated in *Thornton* and the cases following it.

In *Lucas*, the plaintiff purchased two beachfront lots in 1986, for about $1 million, intending to build single-family homes, for which the land was zoned at that time. In 1988, South Carolina passed a Beachfront Management Act, which, in effect, barred Lucas from constructing any habitable structures on the land. The state trial court found that the parcels therefore were rendered valueless by the Act. In *Lucas*, the Supreme Court recounted its regulatory takings jurisprudence, stating again that this area of the law defies clear and objective formulae for decision-making, except in cases of direct physical takings or non-physical takings that clearly deprive the owner of all economic use of the land. *Id.* 120 L Ed 2d at 812-15. The Court stated:

"Where the State seeks to sustain regulation that deprives land of all economically beneficial use, we think it may resist compensation only if the logically antecedent inquiry into the nature of the owner's estate shows that the proscribed use interests were not part of his title to begin with. This accords, we think, with our 'takings' jurisprudence, which has traditionally been guided by the understandings of our citizens regarding the content of, and the State's power over, the 'bundle of rights' that they acquire when they obtain title to property. It seems to us that the property owner necessarily expects the uses of his property to be restricted, from time to time, by various measures newly enacted by the State in legitimate exercise of its police powers; 'as long recognized, some values are enjoyed under an implied limitation and must yield to the police power.'" *Id.* (footnote omitted) (quoting *Pennsylvania Coal Co. v. Mahon*, 260 US 393, 413, 43 S Ct 158, 67 L Ed 322 (1922) (new statute that destroyed previously existing property rights was invalid as taking without compensation)).

The *Lucas* Court addressed a state's sudden elimination of all economically valuable use of land without compensation, holding that:

"Any limitation so severe [as to prohibit all economically beneficial use of land] cannot be newly legislated or decreed (without compensation), but must inhere in the title itself, in the restrictions that background principles *of the State's law of property* and nuisance already place upon land ownership." *Id.*, 120 L Ed 2d at 821 (emphasis added).

As an example, the Court explained that the owner of a lake bed would not be entitled to compensation if denied a permit to engage in landfilling if such an activity would have the effect of flooding another's land, even if the effect of the denial was to eliminate the only economically viable use of the land, because it would not have been "previously permissible under relevant property and nuisance principles." *Id.* at 821. Only when a regulation goes beyond what the relevant background principles of state law would dictate must compensation be paid. *Id.* at 822.

The *Lucas* Court then listed other factors to be considered in determining whether a taking has occurred, including: the degree of harm to public lands and resources posed by the owner's proposed activities; the degree of harm to adjacent private property; the social value and suitability of the owner's proposed activity; the ease with which the harm could be avoided; and the uses engaged in by similarly situated owners. *Ibid.* Having described this analysis, the majority remanded the case to the South Carolina courts for a determination under state law as to whether the ills sought to be avoided by the Beachfront Management Act would have been illegal under the common law of private or public nuisance, recognizing that it was unlikely that this would be the case. *Id.* at 822.

■　Applying the *Lucas* analysis to this case, we conclude that the common-law doctrine of custom as applied to Oregon's ocean shores in *Thornton* is not "newly legislated or decreed"; to the contrary, to use the words of the *Lucas* court, it "inhere[s] in the title itself, in the restrictions that background principles of the State's law of property and nuisance already placed upon land ownership." *Id.* at 821. As noted in *Hay v. Bruno, supra*, 344 F Supp at 289, "there was no

sudden change in either the law or the policy of the State of Oregon. For at least 80 years, the State as a matter of right claimed an interest in the disputed land." Plaintiffs' argument that a "retroactive" application of the *Thornton* rule to their property is unconstitutional, is not persuasive. *Thornton* did not create a new rule of law and apply it retroactively to the land at issue in that case, *Hay v. Bruno, supra*; nor did *Thornton* create a new rule of law as applied to plaintiffs' land here. *Thornton* merely enunciated one of Oregon's "background principles of * * * the law of property." *Lucas, supra*, 120 L Ed 2d at 821. We therefore agree with the Court of Appeals, which concluded that the trial court's reading and application of *Thornton* were correct. 114 Or App at 459.

**4.** When plaintiffs took title to their land, they were on notice that exclusive use of the dry sand areas was not a part of the "bundle of rights" that they acquired, because public use of dry sand areas "is so notorious that notice of the custom on the part of persons buying land along the shore must be presumed." *Thornton, supra*, 254 Or at 598. *See also State Highway v. Fultz, supra*, 261 Or at 289 (public use has existed since 1889). We, therefore, hold that the doctrine of custom as applied to public use of Oregon's dry sand areas is one of "the restrictions that background principles of the State's law of property * * * already place upon land ownership." *Lucas, supra*, 120 L Ed 2d at 821. We hold that plaintiffs have never had the property interests that they claim were taken by defendants' decision and regulations.

Plaintiffs, however, do not simply claim that the doctrine of custom is no longer viable after *Lucas*. They also claim that the various statutory schemes that serve to implement that doctrine are unconstitutional. We proceed to examine that claim.

In the years following the *Thornton* case, the Oregon Beach Bill was revised, and the comprehensive land use laws leading to the eventual implementation of LCDC Goal 18 at state and local levels were enacted. Those laws recognized and accommodated the common doctrine of customary use of Oregon's beaches. The Oregon Beach Bill provides in part:

"(2) · The Legislative Assembly recognizes that over the years the public has made frequent and uninterrupted use of the ocean shore and recognizes, further, that where such use

has been legally sufficient to create rights or easements in the public through dedication, prescription, grant or otherwise, that it is in the public interest to protect and preserve such public rights or easements as a permanent part of Oregon's recreational resources.

"(3)   Accordingly, the Legislative Assembly hereby declares that all public rights or easements legally acquired in those lands described in subsection (2) of this section are confirmed and declared vested exclusively in the State of Oregon and shall be held and administered as state recreation areas.

"(4)   The Legislative Assembly further declares that it is in the public interest to do whatever is necessary to preserve and protect scenic and recreational use of Oregon's ocean shore." ORS 390.610.

In order to implement that policy, the Beach Bill provides that a permit must be obtained for improvements to the ocean shore below the vegetation line (*i.e.*, within the dry sand area of the beach). ORS 390.640(1). An application for such a permit is made to department. After notice and a hearing, and after considering a number of factors, department may approve or deny the permit. ORS 390.650; ORS 390.655. Those factors include:

"(1)   The public need for healthful, safe, esthetic surroundings and conditions; the natural scenic, recreational and other resources of the area; and the present and prospective need for conservation and development of those resources.

"(2)   The physical characteristics or the changes in the physical characteristics of the area and suitability of the area for particular uses and improvements.

"(3)   The land uses, including public recreational use if any, and the improvements in the area, the trends in land uses and improvements, the density of development and the property values in the area.

"(4)   The need for recreation and other facilities and enterprises in the future development of the area and the need for access to particular sites in the area." ORS 390.655.

The standards used by department in issuing a permit are further defined in OAR 736-20-005 to OAR 736-20-030, and include:

"In accordance with the Statewide Land Conservation and Development Commission Goal #18 for Beaches and Dunes, permit applications for beachfront protective structures seaward of the beach zone line will be considered only where development existed on January 1, 1977. The proposed project will be evaluated against the applicable criteria included within Goal #18 and other appropriate statewide planning goals." OAR 736-20-010(6).[13]

LCDC Statewide Planning Goal 18 Implementation Requirements, relating to beaches and dunes, include the following:

"(2)   Local governments and state and federal agencies shall prohibit residential developments and commercial and industrial buildings on beaches, active foredunes, on other foredunes which are conditionally stable and that are subject to ocean undercutting or wave overtopping * * *. Other development in these areas shall be permitted only if the findings required in (1) above[14] are presented and it is demonstrated that the proposed development:

"a.   Is adequately protected from any geologic hazards, wind erosion, undercutting, ocean flooding and storm waves; or is of minimal value; and

"b.   Is designed to minimize adverse environmental effects.

"* * * * *

---

[13] Other considerations specified in OAR 736-20-005 to OAR 736-20-030 include project need, protection of public rights, compliance with other laws, project modification and other costs, scenic, recreational, and safety concerns, and concerns for other resources such as wildlife. Department made detailed findings regarding all of those considerations, all of which, except concerns for other resources such as wildlife, served as bases for denial of the permit. *See* note 4, *supra*.

[14] Those findings must include:

"a.  The type of use proposed and the adverse effects it might have on the site and adjacent areas;

"b.  Temporary and permanent stabilization programs and the planned maintenance of new and existing vegetation;

"c.  Methods for protecting the surrounding area from any adverse effects of the development; and

"d.  Hazards to life, public and private property, and the natural environment which may be caused by the proposed use." LCDC Statewide Planning Goal 18, Implementation Requirements.

The findings accompanying department's denials of plaintiffs' permits satisfy those criteria.

"(5) Permits for beachfront protective structures shall be issued only where development existed on January 1, 1977. Local comprehensive plans shall identify areas where development existed on January 1, 1977. For purposes of this requirement * * *, 'development' means houses, commercial and industrial buildings, and vacant subdivision lots which are physically improved through construction of streets and provision of utilities to the lot and includes areas where an exception to (2) above has been approved.

"The criteria for review of all shore and beachfront protective structures shall provide that:

"a.   visual impacts are minimized;

"b.   necessary access to the beach is maintained;

"c.   negative impacts on adjacent property are minimized; and

"d.   long-term or recurring costs to the public are avoided."

Plaintiffs argue that LCDC Goal 18 itself, as implemented by city ordinance, and as relied on by department as one of the criteria that it used in considering whether a permit should be allowed, is unconstitutional, both facially and as applied to their land.

■       We first address whether the regulations at issue here constitute a facial taking of plaintiffs' land. Plaintiffs argue that, because it prohibits residential developments and commercial and industrial buildings on beaches, LCDC Goal 18 (as codified in both city's ordinance and department's regulations) constitutes a facial taking of their land. In *Dolan v. City of Tigard*, 317 Or 110, 118, 854 P2d 437 (1993), this court stated:

"A land-use regulation does not effect a 'taking' of property, within the meaning of the Fifth Amendment prohibition against taking private property for public use without just compensation, if it substantially advances a legitimate state interest and does not deny an owner economically viable use of the owner's land. *Nollan v. California Coastal Comm'n*, 483 US 825, 835-36, 107 S Ct 3141, 97 L Ed 2d 677 (1987); *Keystone Bituminous Coal Assn. v. DeBenedictis*, 480 US 470, 495, 107 S Ct 1232, 94 L Ed 2d 472 (1987); *Agins v. City of Tiburon*, 447 US 255, 260, 100 S Ct 2138, 65 L Ed 2d 106 (1980)."

Plaintiffs here do not argue that defendants' denials and the authority on which they rely do not substantially advance a legitimate state interest.

■    The Supreme Court has stated that plaintiffs "face an uphill battle in making a facial attack on [a statute or regulation] as a taking." *Keystone Bituminous Coal Assn. v. DeBenedictis, supra,* 480 US at 495. In general, "the constitutionality of statutes ought not be decided except in an actual factual setting that makes such a decision necessary. Adherence to this rule is particularly important in cases raising allegations of an unconstitutional taking of private property." *Hodel v. Virginia Surface Mining & Reclamation Assn., Inc.,* 452 US 264, 294, 101 S Ct 2352, 69 L Ed 2d 1 (1981) (citations omitted).

> "The test to be applied in considering this facial challenge is fairly straightforward. A statute regulating the uses that can be made of property effects a taking if it 'denies an owner economically viable use of his land * * *.' " *Id.* (quoting *Agins v. Tiburon,* 447 US 255, 295-96, 100 S Ct 2138, 65 L Ed 2d 106 (1980)).[15]

Plaintiffs argue that the regulation and ordinance deprive them of all economically viable use of their property. It is clear from LCDC Goal 18, however, as well as from the regulations and ordinances at issue here, that what is prohibited is "residential developments and commercial and industrial buildings." Not all economically viable uses of plaintiffs' property falls within that prohibition. Notably, in some circumstances, LCDC Goal 18's implementation requirements appear to allow for single-family dwellings. *See, e.g.,* LCDC Goal 18, Implementation Requirement 4. Moreover, LCDC Goal 18, as well as the rules and ordinances, provides for development of beach front protective structures. Although Implementation Requirement 2, cited by plaintiffs, does prohibit residential developments and commercial and industrial buildings on beaches, Implementation Requirement 5 specifically *allows* beach front protective structures such as seawalls in some circumstances. The provisions of city's Comprehensive Plan and Zoning Ordinance 79-4A, as well as

---

[15] *See Agins v. Tiburon,* 447 US 255, 260-61, 100 S Ct 2138, 65 L Ed 2d 106 (1980) ("Although no precise rule determines when property has been taken, the question necessarily requires a weighing of private and public interests").

department's administrative rules (OAR 736-20-005 to 736-20-020) comport with those implementation requirements. *See* notes 3, 4, *supra.* Because LCDC Goal 18 makes provisions for certain economically viable uses of private beaches and dunes, we conclude that city's ordinances and department's administrative rules implementing that goal do not constitute a facial taking of private property.

■ Turning to plaintiffs' "as applied" challenges, we note that plaintiffs' focus in this case has been their inability to construct a *motel or hotel* on their lots. Implicit in their arguments is the assumption that that is the "economic use" that they have been denied. That assumption, however, is mistaken. Plaintiffs were not denied permits to construct a *motel or hotel* on their lots; rather, they were denied permits to construct a *seawall.* Plaintiffs do not contend that the seawall itself is a residential development or a commercial or industrial building prohibited by the ordinances and rules at issue here. We decline, therefore, to analyze plaintiffs' "as applied" taking claim *as if* a permit to build a motel or hotel had been denied under the LCDC Goal 18 criteria. That simply is not the case.

City's findings of fact state that "the area of the proposed seawall was 'developed' in January 1977. Therefore, beachfront protective structures, such as a seawall, may be permitted." Complaint, Exhibit 1, at 13; *see* LCDC Goal 18 Implementation Requirement 5, quoted *supra.* Thus, plaintiffs' attack on city's ordinances, at best, is indirect, because it is clear that in some circumstances seawalls may be permitted. Plaintiffs rely on city's findings of fact that the purpose of the proposed seawall is "to stabilize and protect private property and that after the construction of the seawall the property *may* be used for commercial purposes." Complaint, Exhibit 1, at 4 (emphasis added).

Only one of city's 14 findings of fact relates to the possible commercial use of the lots; it indicates that the purpose of the proposed seawall was not to minimize an erosion hazard but, rather, to facilitate commercial development in a manner inconsistent with the general prohibition on residential developments and commercial and industrial buildings on beaches. Neither city's findings nor its ordinances suggest that exceptions consistent with the provisions

of LCDC Goal 18 never would be allowed. City's findings show that plaintiffs failed to comply with *10* of city's 14 standards. Nine of those failures to comply were not directly concerned with the possible commercial use of the property. Thus, it is far from clear that meeting the "other technical objections" (as plaintiffs describe those numerous other criteria that their permit applications failed to meet) would not have resulted in city's approval of plaintiffs' conditional use permit to build a seawall.

Department's denial of the permit was based on numerous other criteria as well.[16] *See* note 4, *supra*. Plaintiffs do not argue that those criteria are unconstitutional. We conclude, therefore, that department's findings regarding the LCDC Goal 18 criteria, flawed though they were, did not necessarily cause the denial of the permit to build a seawall.

The purpose of LCDC Goal 18 is

"To conserve, protect, where appropriate develop, and where appropriate restore the resources and benefits of coastal beach and dune areas; and

"To reduce the hazard to human life and property from natural or man-induced actions associated with these areas."

Department's administrative rules and city's ordinances at issue in this case serve to mesh the purposes of the common law of custom, the Beach Bill, and LCDC Goal 18.

---

[16] The state's denial of the permits to build the seawall was premised on its findings that plaintiffs failed to meet the criteria set forth in OAR 736-20-005 through OAR 736-20-025. Only OAR 736-20-010(6) pertains to the requirements of LCDC Goal 18. In its finding pertaining to this subsection, however, the state erroneously found that no development existed on these lots before January 1, 1977. Complaint, Exhibit 2, at 9. This finding conflicts with city's finding in this regard, as well as the facts as stated in plaintiffs' complaint, which we take as true for purposes of this review. The lots in question were "developed" under the definition provided in LCDC Goal 18 Implementation Requirement 5, because they were "vacant subdivision lots which are physically improved through construction of streets and provision of utilities[.]" We conclude that the state's finding was erroneous, but we are unable to conclude that the error was the reason for denial of the permit in the present case or that compliance with "technical objections" would have been futile.

Had plaintiffs pursued the remedy available for review of department's decision, that error could have been addressed. ORS 390.658. Plaintiffs, however, chose to dismiss their claim under that statute. The fact that review of this issue would have been available under ORS 390.658 certainly undermines plaintiffs' claim that pursuit of other remedies would have been futile.

Because the administrative rules and ordinances here do not deny to dry sand area owners all economically viable use of their land and because "the proscribed use interests" asserted by plaintiffs were not part of plaintiffs' title to begin with, they withstand plaintiffs' facial challenge to their validity under the takings clause of the Fifth Amendment. *Lucas, supra*, 120 L Ed 2d at 820. Moreover, because it is clear that, under the challenged ordinances and regulations, a seawall could be built on plaintiffs' land if the other criteria, not challenged in this case, were met, those sources of law withstand an "as applied" challenge in the present case. We hold that there was no taking of plaintiffs' property within the meaning of the Fifth Amendment. *Lucas, supra.*

The decision of the Court of Appeals and the judgment of the circuit court are affirmed.