Mr. Randall Mathis, Director Arkansas Department of Environmental Quality 8001 National Drive P.O. Box 8913 Little Rock, Arkansas 72219-8913
Dear Mr. Mathis:
This is in response to your request for an opinion on the following two questions:
 Does the change in the buffer zone distance found in Arkansas Pollution Control and Ecology Commission Regulation No. 15, Section 15.402 (G) from a previously non-quantified level of protection for a waterway to a quantified buffer zone of one hundred (100) feet constitute a `takings' under the Fifth Amendment?
 Does the change in the buffer zone distance found in Arkansas Pollution Control and Ecology Commission Regulation No. 15, Section 15.403 (D) from twenty-five feet to one hundred (100) feet constitute a `takings' under the Fifth Amendment?
RESPONSE
It is my opinion, as a general matter, that the mere enactment of Regulation 15 does not amount to a "taking" of property under the Fifth Amendment. A "facial" challenge in this regard will not succeed. The question of whether Regulation 15 would constitute a "taking" as applied to a particular piece of property involves a factual inquiry, but it is my opinion, as a general matter, that a plaintiff pursuing such a claim would be unsuccessful.
Proposed Amendments to Regulation 15
"Regulation 15" is "The Arkansas Open-Cut Mining and Land Reclamation Code" (the "Code"). The Regulation is adopted under the authority of the "Open-Cut Land Reclamation Act" (A.C.A. §§ 15-57-301 to -320) and the "Arkansas Water and Air Pollution Control Act" (A.C.A. §§ 8-4-101 to -315). See Code, § 15.101. Its purpose is to "protect the public health, safety, and the environment during and after completion of open-cut or stream bed mining operations." Code § 15.102. "Proposed Changes to Regulation Number 15" were adopted by the Arkansas Pollution Control and Ecology Commission on June 25, 1999 and were filed with the Secretary of State on July 7, 1999 pursuant to the "Administrative Procedures Act" (A.C.A. 25-15-201 to -214). The proposed changes were revised on November 2, 1999.
As your question indicates, the most relevant changes made to Regulation 15 for the purposes of a "takings" analysis are two separate changes, which require two separate "buffer zones" near "waterways." The latter term is defined as including the "natural channel of any perennial or intermittent river, creek or stream." Code § 15.201. Specifically, proposed Section 15.402(G) and Section 15.403(D) provide, respectively, as follows:
 If the permit area is near or includes a waterway, an undisturbed buffer zone must be maintained between the permit boundary and the ordinary high-water mark.[1] The ordinary high-water mark elevation at the upstream and downstream limits of the permit area shall be determined numerically by the Department and included as a permit condition. If the applicant proposes a buffer zone of less than 100 feet, reasonable scientific and technical data based on the site specific conditions such a geology, soil type, slope, or waterway use designation that shows the proposed buffer zone will protect stream channel integrity must be presented to and approved by the Director. If after review of the data submitted by the applicant, the Director determines that the proposed buffer zone is not adequate, then the buffer zone shall be established by the Department not to exceed 100 feet measured horizontally from the ordinary high-water mark.
* * *
 An undisturbed buffer zone must be maintained from the ordinary high-water mark landward for the length of the material removal site. If the applicant proposes a buffer zone of less than 100 feet, reasonable scientific and technical data based on the site specific conditions such as geology, soil type, slope, or waterway use designation that shows the proposed buffer zone will protect the water quality of the waterways must be presented to and approved by the Director. If after review of the data submitted by the applicant, the director determines that the proposed buffer zone is not adequate, then the buffer zone shall be established by the Department not to exceed 100 feet measured horizontally from the ordinary high-water mark. Disturbance in this buffer zone shall be limited to well maintained access roads for ingress and egress only and when no other reasonable access is available. Upon temporary or permanent cessation of material removal at a site, steps shall be taken to minimize the amount of surface water and sediment that may enter the stream via an unvegetated access road.
The first provision cited above changed the previous requirement, which merely provided that if the permit area was near or included a waterway "provisions must be made to protect the waterway from degradation of its water quality or flow." See former Section 15.402(G). This first buffer requirement must be between the permit boundary and the ordinary high-water mark and runs the length of the upstream and downstream limits of the "permit boundary." It may be as much as 100 feet wide unless the data presented indicate that a smaller width would protect "stream channel integrity."
The second buffer zone provision changes the former twenty-five foot "buffer" requirement to a buffer up to a maximum of one hundred feet from the high-water mark landward. See former Section 15.403(D). A smaller buffer is allowed if supporting data indicate that a smaller buffer would "protect the water quality of the waterway." Code, § 15.403(D). This second requirement runs the length of the "material removal site." Mining is not allowed in the buffer zones. Mining is allowed outside the buffer zones and indeed below the "bankfull elevation," but in the latter case only under certain conditions. See § 15.401(B).[2] Mining is allowed in the stream bed under certain conditions.[3]
Your question is whether these changes in Regulation 15 "constitute a `takings' under the Fifth Amendment." It is my opinion that on its face, the answer is "no." The question of whether Regulation 15 will constitute a "taking" as applied to a particular parcel of property will turn upon a factual inquiry, but in my opinion a plaintiff pursuing such a claim would not succeed.
Regulatory Taking Jurisprudence
The history of what is referred to as the law of "regulatory takings" is described in A Setback for the Rivers of Massachusetts? An Application ofthe Regulatory Takings Doctrine to the Watershed Protection Act and theMassachusetts River Protection Act, 73 B.U.L. Rev. 237 (March 1993):
 The Just Compensation Clause of the Fifth Amendment provides:" nor shall private property be taken for public use, without just compensation." Courts initially required compensation under this clause only when the government physically exerted dominion or control over private property. Historically, then, the government could regulate the use of private property without compensating the owner. In 1922, however, Justice Oliver Wendell Holmes recognized that a regulation that "goes too far" in restricting an owner's use of his land could be a taking requiring just compensation. Justice Holmes elaborated, stating that whether the state's regulation has "gone too far" is "a question of degree-and therefore cannot be disposed of by general propositions."
Id. at 246-247, quoting from Pennsylvania Coal Co. v. Mahon, 260 U.S. 393
(1922).
Justice Holmes expressed his views in a case called Pennsylvania CoalCo. v. Mahon, 260 U.S. 393 (1922) and the doctrine of "regulatory takings" was born.[4] As more recently stated by the United States Supreme Court, however, in "70-odd years of succeeding `regulatory takings' jurisprudence, we have generally eschewed any `set formula' for determining how far is too far, preferring to engag[e] in . . . essentially ad hoc, factual inquiries." Lucas v. South Carolina CoastalCouncil, 505 U.S. 1003, 1015 (1992), citing Penn Central TransportationCo. v. New York City, 438 U.S. 104, quoting Goldblatt v. Hempstead,369 U.S. 590, 594 (1962).
The Court in Lucas made substantial changes in the law of regulatory takings. The Court announced two instances in which a "categorical" or "per se" taking will occur. If the land use regulation "does not substantially advance legitimate state interests" or denies an owner "all economically beneficial uses" of his land, a per se "taking" will be found. Id. at 1019. With regard to the first type of per se taking, a government action fails to substantially advance a legitimate state interest where it: 1) lacks a rational nexus to the state interest, or 2) lacks reasonable proportionality to the impacts of the project being regulated. Nollan v. California Coastal Commission, 483 U.S. 825 (1987); and Dolan v. City of Tigard, 512 U.S. 374 (1994). In many cases, the plaintiff concedes the existence of a "legitimate state interest" and focuses his efforts instead on trying to prove the second factor leading to a per se taking — that the regulation deprives him of "all economically beneficial use" of his land. See e.g., Reahard v. LeeCounty, 968 F.2d 1131 (11th Cir. 1992) (stating that just compensation claims admit and assume that the subject regulation substantially advances a legitimate government interest); Lucas, supra and Penn CentralTransportation Co. v. New York City, 438 U.S. 104 (1978). The Court has called the existence of the latter situation, however, "an extraordinary circumstance," and "relatively rare." Lucas, supra at 1017, 1018.[5]
Notwithstanding a finding that a plaintiff has been denied "all economically beneficial uses" of his land, there is one exception to what otherwise would be characterized as a "categorical" taking for purposes of the Fifth Amendment. The Court in Lucas stated that:
 Where the State seeks to sustain regulation that deprives land of all economically beneficial use, we think it may resist compensation only if the logically antecedent inquiry into the nature of the owners' estate shows that the proscribed use interests were not part of his title to begin with. . . . Any limitation so severe cannot be newly legislated or decreed (without compensation), but must inhere in the title itself, in the restrictions that background principles of the State's law of property and nuisance already place upon land ownership. A law or decree with such an effect must, in other words, do no more than duplicate the result that could have been achieved in the courts — by adjacent landowners (or other uniquely affected persons) under the State's law of private nuisance, or by the State under its complementary power to abate nuisances that affect the public generally, or otherwise.
Id. at 1027, 1029.
The Lucas case only involved a situation in which the State had deprived the property owner of all economically beneficial uses of his land. The Court remanded the case for a determination of whether the State of South Carolina could meet the so-called "nuisance" exception discussed above. The Court indicated, however, that in most cases, a property owner will not be deprived of "all economically beneficial uses" of his property.See discussion supra, at 6. In such case, a plaintiff may not claim the benefit of the "categorical" formula announced in Lucas, and the question will be determined by application of the "balancing test" developed through pre-Lucas precedents. See generally, Lucas, supra, at n. 8 andPenn Central Transportation Co. v. New York City, 438 U.S. 104 (1978). The Court in Penn Central employed a balancing test to determine whether a particular regulation had "gone too far" and thus constituted a "taking" for purposes of the Fifth Amendment. Three separate criteria are usually given consideration under this test: 1) the character of the government regulation; 2) the economic impact of the regulation on the plaintiff; and 3) the extent to which the regulation interferes with distinct investment-backed expectations of the property owner. This test employs the type of "ad hoc factual analysis" referred to by the Lucas
Court. The Court also noted that a mere diminution in property value, even if significant, is not sufficient to establish a "taking." PennCentral, supra at 131. See also in Arkansas, Barrett v. Poinsett County,306 Ark. 270, 811 S.W.2d 324 (1991); Winters v. State, 301 Ark. 127,782 S.W.2d 566 (1990); and J.W. Black Lumber Co. v. Arkansas Department ofPollution Control, 290 Ark. 170, 717 S.W.2d 807 (1986). The Court in PennCentral, quoting a 1922 precedent, noted that: "`Government could hardly go on if to some extent values incident to property could not be diminished without paying for every such change in the general law.'"Id. at 124, quoting Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 413
(1922).
With regard to the first criterion (the character of the government action), it has been stated that: "Under the Penn Central balancing approach, the inquiry into the character of the government action focuses on whether there is a physical invasion of private property or whether the action is a legitimate form of regulation. Regulations that impose permanent physical invasions are considered per se takings. Traditionally, regulations that prevent harm to the public or protect a public interest in quality of life and the environment are considered legitimate exercises of the police power that do not constitute a taking." Municipal Riparian Buffer Regulations in Pennsylvania —Confronting the Regulatory Takings Doctrine, 7 Dickinson J. Envtl. L and Pol'y 207 (Fall 1998).
The second factor, the "economic impact of the regulation," "requires a comparison between the value that has been taken from the property with the value that remains in the property."[6] Id., citing KeystoneBituminous Coal Ass'n v. DeBenedictis, 480 U.S. 470 (1987). Even a significant reduction in the value of property will not alone constitute a "taking." See, e.g., Euclid v. Ambler Realty Co., 272 U.S. 365 (1926) (finding no taking even where zoning ordinance caused 75% reduction in value); and Hadacheck v. Sebastain, 239 U.S. 394 (1915) (finding no taking even where zoning ordinance caused 87.5% reduction in value). Seealso in Arkansas Barrett, supra; Winters, supra; and J.W. Black LumberCo., supra.
With regard to the third criterion (the "reasonable investment-backed expectation" factor) "the most basic axiom is that such an expectation `must be more than a unilateral expectation or an abstract need.'" TripleWays to Take: The Evolution and Meaning of the Supreme Court's ThreeRegulatory Taking Standards, 71 Temp. L. Rev. 243 (1998), citingRuckelshaus v. Monsanto Co., 467 U.S. 986 (1984), quoting Webb's FabulousPharmacies, Inc. v. Beckwith, 449 U.S. 155 (1980). "Some courts have made the expectations factor decisive when the landowner obtained the property with knowledge of the regulation, holding that `The "reasonable investment-backed expectations" of the regulated party is [sic] the dispositive factor in takings analysis when the regulated party is "on notice" of the extent of the government's regulatory authority over its property.'" Id. at 272, citing State Department of Health v. The Mill,887 P.2d 993 (Colo. 1994), cert denied, 515 U.S. 1159 (1995) and Monsanto,supra.
In this vein, it has been stated, with regard to this third criterion, that "those who do business in a regulated field cannot object if the legislative scheme is buttressed by subsequent amendments to achieve the legislative end." FHA v. The Darlington Inc., 358 U.S. 84, 91 (1958), quoted with approval in Concrete Pipes and Products of California Inc.v. Construction Laborers Pension Trust for Southern California,508 U.S. 602 (1993).
The foregoing discussion summarizes the relevant factors to be considered in analyzing a "takings" claim under the Fifth Amendment. Certain factors may lead to categorical or "per se" takings, although there is a so-called "nuisance" exception to these per se takings. If a categorical or per se taking cannot be established, which is the usual case, the three factor balancing test set out above is applied to the facts of a particular case.
It must be emphasized that a "takings" analysis can only be definitively undertaken in light of the specific facts of a particular claim. This fact has been repeatedly emphasized by the United States Supreme Court.See, e.g., Hodel v. Virginia Surface Mining Reclamation Association,452 U.S. 264 (1981). In Hodel, the Court upheld, as against a facial Fifth Amendment challenge, the federal "Surface Mining Control and Reclamation Act of 1977." The Court stated:
 Because appellees' taking claim arose in the context of a facial challenge, it presented no concrete controversy concerning either application of the Act to particular surface mining operations or its effect on specific parcels of land. Thus, the only issue properly before the District Court and, in turn, this Court, is whether the `mere enactment' of the Surface Mining Act constitutes a taking. [Citation omitted.] The test to be applied in considering this facial challenge is fairly straightforward. A statute regulating the uses that can be made of property effects a taking if it `denies an owner economically viable use of his land. . . ." [Citation omitted.] The Surface Mining Act easily survives scrutiny under this test.
First, the Act does not, on its face, prevent beneficial use of coal-bearing lands. Except for the proscription of mining near certain locations by § 522(e),[7] the Act does not categorically prohibit surface coal mining; it merely regulates the conditions under which such operations may be conducted. The Act does not purport to regulate alternative uses to which coal-bearing lands may be put. Thus . . . there is no reason to suppose that `mere enactment' of the Surface Mining Act has deprived appellees of economically viable use of their property.
452 U.S. at 295-297.
The Court in Hodel also noted that there was no evidence that the appellees had availed themselves of the opportunities provided in the Act for administrative relief or a waiver of the requirements. The Court thus felt the "takings" issue was not ripe for review.[8]
Application of "takings" law to Regulation 15
Although most takings claims must thus be reviewed in light of discrete facts, several general conclusions can be reached about a potential "takings" claim brought in light of the proposed changes to Regulation 15.
First, consonant with the language of Hodel above, it is my opinion that the "mere enactment" of these proposed changes will not support a successful takings claim. The proposed changes do not categorically prohibit mining or purport to regulate alternate uses to which land may be put. They impose limited, flexible and specific regulations governing areas in which mining may not occur. Administrative avenues of relief are available. A facial challenge, in my opinion, would be unsuccessful. The Court in Keystone, supra, recognized that plaintiffs pursuing such claims "face an uphill battle." 480 U.S. at 495.
Second, even assuming a plaintiff brought a fact-based challenge involving a particular piece of property, the possibility of a judicial finding of a categorical or "per se" taking under the test set down inLucas is remote. The legitimacy of the state's interest in protecting the integrity and environment surrounding the waterways of Arkansas is, in my opinion, beyond dispute. See, e.g., Keystone Bituminous Coal Ass'n v.DeBenedictis, 480 U.S. 470 (1987) (approving, as against a takings challenge, governmental regulations "to protect the public interest in health and the environment"); A Setback for the Rivers of Massachusetts?An Application of the Regulatory Takings Doctrine to the WatershedProtection Act and the Massachusetts River Protection Act, 73 B.U.L. Rev. 237 (March 1993) (stating that the legitimacy of a waterway buffer zone requirement in Massachusetts was "beyond reproach"). See alsoMunicipal Riparian Buffer Regulations in Pennsylvania — Confronting theRegulatory Takings Doctrine, 7 Dickinson J. Envtl. L and Pol'y 207 (Fall 1998) (stating that "a court should thus have no difficulty in finding that the protection of water quality [through buffer zones] is a legitimate Commonwealth interest for the benefit of public health, safety, and welfare). See also, Just v. Marinette County, 56 Wis.2d 7,201 N.W.2d 761 (1972) (stating that there can be "no disagreement" over the public purpose sought to be achieved by an ordinance preventing changes in natural character of land within specified distances from lakes and rivers). In my opinion, additionally, the proposed changes to Regulation 15 would be held to "substantially advance this objective.See Municipal Riparian Buffer Regulations in Pennsylvania — Confrontingthe Regulatory Takings Doctrine, 7 Dickinson J. Envtl. L and Pol'y 207 (Fall 1998) (stating that "[p]lanners generally consider a riparian buffer width of seventy-five to one hundred feet on each side of a stream adequate to achieve substantial environmental benefits") and A Setbackfor the Rivers of Massachusetts? An Application of the Regulatory TakingsDoctrine to the Watershed Protection Act and the Massachusetts RiverProtection Act, 73 B.U.L. Rev. 237 (March 1993) (stating that "[b]order or buffer zones along the edges of affected waterways can effectively control [nonpoint source pollution.]"
Assuming a legitimate state interest that is substantially advanced by the Regulation, the only other way a potential plaintiff could prove a "per se" taking claim under the Fifth Amendment is to show that the Regulation deprives him of "all economically beneficial use" of his land. As noted by the United States Supreme Court, this is an "extraordinary circumstance." See supra page 6 quoting Lucas, supra at 1017, 1018.
Even if, by some stretch of the imagination, such a plaintiff existed, no "taking" would be declared with respect to his land, even under a "perse" takings analysis, if the State proved that the existing use could have been prevented as a "nuisance" under background principles of state law. In this regard, state law already acknowledges the authority of the State to bring nuisance actions to protect the integrity of the State's waterways. See, e.g., A.C.A. § 8-4-107 (Supp. 1999). In addition, the case of Meriwether Sand and Gravel v. State ex rel. Attorney General,181 Ark. 216, 26 S.W.2d 57 (1930) would prove strong authority for the proposition that persons engaging in mining operations are on notice that they may not use their property in such a way as to cause detriment to the rights of the public or downstream landowners. In Meriwether, the Arkansas Supreme Court enjoined the defendant from discharging its upland gravel bed washings into Bodcaw Creek, stating that the state's "regulatory power in this regard has been recognized from earliest times to inhere in the State." Id. at 225. The court also noted that the placing of mill refuse in a stream inhabited by fish "may be considered a nuisance," and the Attorney General may procure an injunction against such action. This conclusion obtained even on a non-navigable waterway and in the absence of any formal recognition of the rights of the public to the Creek. Where formal prescriptive rights have been judicially declared, the nuisance exception to a "per se" taking may be all the more applicable. See, e.g., Lucas, supra, at 1029 stating that: "we assuredly would permit the government to assert a permanent easement that was a pre-existing limitation upon the landowner's title) and generally Stevensv. City of Cannon Beach, 317 Or. 131, 854 P.2d 449 (1993) (public easement obtained by doctrine of "custom" was not newly decreed upon judicial decision for purposes of "takings" analysis), citing Hay v.Bruno, 344 F.Supp. 286 (D.Or. 1972). See also Arrington v. Mattox,767 S.W.2d 957 (Tex.App. 1989) (recognizing the distinction between a governmental taking of an easement through an act of sovereignty and judicial recognition of a common law easement acquired through historical public use and holding that the latter did not amount to a "taking").
Third, absent a "categorical" or "per se" taking, it is my opinion that a putative plaintiff under Regulation 15 would have great difficulty succeeding under the three-factor Penn Central balancing test. As just noted, the "character of the government action" (the first factor), in terms of regulating in the public interest, is beyond dispute. No physical invasion is contemplated. The state is not seeking to obtain some new benefit for its citizens, but to preserve what already belongs to them. The second factor (economic impact) will not be controlling even in the face of a dramatic drop in the property value. See Hadacheck andEuclid, supra. The third factor (reasonable investment-backed expectations) cannot, in my opinion, be controlling in an area so consistently subjected to regulation by the state. See FHA v.Darlington, Inc. supra. It has been stated, therefore, in a similar context, that "despite potentially severe economic impacts, current takings jurisprudence offers little hope to affected landowners." ASetback for the Rivers of Massachusetts? An Application of the RegulatoryTakings Doctrine to the Watershed Protection Act and the MassachusettsRiver Protection Act, 73 B.U.L. Rev. 237 (March 1993).
It is my opinion, in light of all the foregoing, that the proposed changes to Regulation 15 would not give rise to a successful "takings" challenge under the Fifth Amendment.
Senior Assistant Attorney General Elana C. Wills prepared the foregoing opinion, which I hereby approve.
Sincerely,
MARK PRYOR Attorney General
MP:ECW/cyh
[1] The "ordinary high-water mark "means that line delimiting the bed from the bank and is found by ascertaining where the presence and actions of water are so usual and long, continuing in ordinary years, as to mark upon the soil or the bed a character distinct from that of the banks, with respect to vegetation and the nature of the soil." Code § 15.201.
[2] The "bankfull elevation" is defined as "the location of the water level in a stream when it begins to move across its flood plain which occurs at a frequency of approximately every 1.5 years and can be identified using one or more visual or physical indicators, including but not restricted to, the presence of a flood plain at an elevation where flooding begins, the elevation associated with the top of the highest depositional feature (e.g. point bars or central bars within the active channel), a break in the slope of the banks, or staining of large rocks in the channel." Code, § 15.201. "Removal of alluvial materials below the bankfull elevation of a stream or other waterway shall be permitted only if an operator demonstrates to the satisfaction of the Department that activities associated with the removal, processing, or transport of said materials will not cause a violation of the State's water quality standards and will provide for preservation of bank stability and stream channel integrity, and maintain localized in-stream fish cover. Throughout the performance of any permitted mining activities, the operator must implement measures approved in the operator's mining and reclamation plans to insure that the affected area does not contribute sediment to the stream and restrict access to the site to enhance stream recovery. In addition to compliance with the applicable requirements of the Act and other provisions of this Code, compliance with the performance standards listed in Section 15.403 is required." Code, § 15.401 (B). In addition, no "mechanical material processing or storage shall occur below the bankfull elevation" or within the buffer zone. § 15.403 (F). The "buffer zones" do not apply to the noncommercial removal of materials from lands by the owner of the lands for his exclusive use on construction, improvement, or maintenance of roads or other projects on land owned by the owner." § 15.301 (G)(1).
[3] Section 15.403 (A) provides in this regard that "[m]aterial removal below the bankfull elevation must not create a violation of any of the State's water quality standards established by the Commission. At no time shall equipment such as trucks, loaders or dozers be allowed to operate in the water except as otherwise provided by the Act and this Code." Subsection (B) of the same section provides that "[m]aterial removal must not be conducted below an elevation of one (1) foot above the elevation of the surface of the water at the time of removal. If the stream is dry, material removal may proceed to a depth equivalent to one (1) foot above the lowest point of a cross-section of the stream at that location. At no time shall any material removal create a condition(s) that will cause the stream to change course or alter the location of the deepest part of the stream channel or cause bank or channel instability."
[4] The doctrine is sometimes referred to as "inverse condemnation."See e.g., Barrett v. Poinsett County, 306 Ark. 270, 811 S.W.2d 324
(1991).
[5] A question which arises with regularity in this vein is how to define the property interest affected by the regulation. Is the economic impact of a regulation judged only as to that portion of the property affected by the regulation, or is the parcel viewed as a whole? In previous cases, the Court adopted the latter view (see Keystone BituminousCoal Company v. DeBenedictis, 480 U.S. 470 (1987) and Penn Central,supra), but a footnote in the Lucas case has clouded the issue. SeeLucas, supra at n. 7.
[6] Again, defining the property interest may be important in the application of this criterion. See n. 5, supra.
[7] Section 522(e)(4) and (5) of the federal Act prohibited surface mining within 100 feet of a cemetery or the right-of-way of a public road, and within 300 feet of an occupied dwelling, public building, school, church, community or institutional building, or public park. SeeHodel, supra at n. 36.
[8] For other cases addressing the compensability of government actions regulating mining operations, see Keystone v. Bituminous Coal Ass'n v.DeBenedictis, 480 U.S. 470 (1987) (Pennsylvania statute that required coal mining companies to leave fifty percent of the coal beneath certain protected structures and watercourses was a legitimate regulation and did not amount to a "taking"); Goldblatt v. Hempstead, 369 U.S. 590 (1962) (ordinance prohibiting sand and gravel excavating below the water table did not amount to a "taking"); M J Coal Company v. U.S., 47 F.3d 1148
(Fed. Cir. 1995) (enforcement of regulations under federal Surface Mining Control and Reclamation Act did not amount to a "taking"); Florida RockIndustries, Inc. v. United States, 1999 WL 692836 (U.S. Court of Federal Claims) (Corps of Engineers denial of permit to mine limestone in wetlands area required just compensation where no other beneficial use of the property remained, and the government was attempting to obtain a new benefit for its citizens rather than preserving the status quo).