### J.W. BLACK LUMBER COMPANY, INC. *v.*
### ARKANSAS DEPARTMENT OF POLLUTION
### CONTROL AND ECOLOGY

86-43                                                   717 S.W.2d 807

Supreme Court of Arkansas
Opinion delivered October 20, 1986

*Gary Day Garland*, for appellant.

*Martha M. Adcock*, for appellee.

STEELE HAYS, Justice. Black Lumber Company, Inc. has operated a sawmill near Corning, Arkansas, since 1897. In 1966 it installed a teepee burner for the disposal of bark and other

waste material produced by the mill. In 1983 the Arkansas Department of Pollution Control and Ecology filed suit against the lumber company for violation of the Arkansas Air Pollution Control Code, seeking to enjoin those operations of the mill which permit the emission of air pollutants in violation of the Code.

In trial before the chancellor the lumber company did not deny its operation was in violation of the Code, but defended on the ground that the Code, or portions of it, were unconstitutionally discriminatory, and that the cost of compliance was so exorbitant it would be tantamount to a taking of private property without just compensation, prohibited by the Fifth Amendment to the United States Constitution. The chancellor granted the injunction but stayed enforcement pending the outcome of Black's appeal to this Court. Our jurisdiction arises under Rule 29(1)(a) and (c). We affirm the chancellor.

I

The Arkansas Water and Air Pollution Control Act, Ark. Stat. Ann. § 82-1901 et seq. (Repl. 1976 and Supp. 1985) originated in 1949 with respect to water protection, and was later amended to prohibit certain forms of air pollution. Rules and regulations were adopted by the Department to implement the aims of that legislation.

The Arkansas Air Pollution Control Code was adopted in 1969. Sections 4 and 5 of the Code prohibit visible emissions exceeding certain limits and the open burning of waste material in violation of prescribed standards. Under the provision of the Code various activities are exempted, e.g., burning to clear crop lands for agricultural purposes, applying base or surface materials to roads and pavements, the use of heating equipment and incinerators for small apartment buildings (four families or less), the use of non-commercial outdoor fireplaces and grills used in connection with a residence, land clearing operations, wood burning fireplaces, and so forth. Black maintains that to prohibit smoke production by a commercial entity while exempting the identical activity by agricultural and residential producers is a denial of the equal protection of the law under the Fourteenth Amendment and Article 2, Section 18 of the Arkansas Constitution.

■ The issue, however, is *not* whether regulations under

the Code allow differences in the treatment of activities generally similar in character, but whether there is a rational basis for such differences. The equal protection clause does not require that all persons be dealt with identically, only that classifications rest on real rather than feigned differences, that the distinctions have some relevance to the purpose for which the classification is made, and that the treatment be not so disparate as to be wholly arbitrary. *Schock* v. *Thomas*, 274 Ark. 493, 625 S.W.2d 521 (1981); *Walters* v. *City of St. Louis*, 347 U.S. 231 (1954); *Skinner* v. *Oklahoma*, 316 U.S. 535 (1942).

We have no difficulty in recognizing a rational basis for distinguishing between air pollution attributable to commercial incinerators for burning waste materials, on the one hand, and agricultural clearing and residential fireplaces and grills on the other. One is heavily concentrated and continuous, a high intensity contributor to air pollution. The other group is a low producer in comparison, and is dispersed throughout residential or agricultural areas. Too, burning within the latter class tends to occur only periodically.

The equal protection clause does not prohibit legislation that recognizes "degrees of evil," *Traux* v. *Raich*, 239 U.S. 33, 43 (1915), nor require that things which are different in fact or opinion be treated in law as though they were the same. *Tigner* v. *Texas*, 310 U.S. 141 (1940). A state is not constrained in the exercise of its police power to ignore experience which marks a class of offenders or a family of offenses for special treatment. Nor is it prevented by the equal protection clause from confining its restrictions to "those classes of cases where the need is deemed to be clearest." *Miller* v. *Wilson*, 236 U.S. 373, 384 (1915). "[T]he law does all that is needed when it does all that it can, indicates a policy, applies it to all within the lines, and seeks to bring within the lines all similarly situated so far and so fast as its means allow." *Buck* v. *Bell*, 274 U.S. 200, 208 (1927). "A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it." *McGowan* v. *Maryland*, 366 U.S. 420, 426 (1961). The chancellor's finding that the legislation is not unconstitutional was correct.

## II

■   Black also takes the position its due process rights under the Fifth Amendment and under Article 2, Section 22 of the Arkansas Constitution are violated because it is deprived of its property without just compensation. The law recognizes a point at which regulation so restricts the use of property that it exceeds mere regulation and becomes a taking. When that line is crossed, both Constitutions require that the taking be in accordance with the laws of eminent domain. Mr. Justice Holmes summarized the pertinent principle of law in *Pennsylvania Coal Co.* v. *Mahon*, 260 U.S. 393, 413 (1922):

> Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law. As long recognized, some values are enjoyed under an implied limitation and must yield to the police power. But obviously the implied limitation must have its limits, or the contract and due process clauses are gone. One fact for consideration in determining such limits is the extent of the diminution. When it reaches a certain magnitude, in most if not in all cases there must be an exercise of eminent domain and compensation to sustain the act. So the question depends upon the particular facts. The greatest weight is given to the judgment of the legislature, but it always is open to interested parties to contend that the legislature has gone beyond its constitutional power.

Here, the proof was not sufficient to show that a taking effectively resulted from enforced compliance. Mr. John Black estimated the cost of bringing the waste burner into compliance at between $500,000 and $1,000,000 and said a debt of that magnitude would force the company to cease operations. But those were his own conclusions and, in view of his interest in the company, were not binding on the chancellor. *Old Republic Insurance Co.* v. *Alexander*, 245 Ark. 1029, 436 S.W.2d 829 (1969). Assuming that estimate of the expense was accurate, there was no proof of the company's net worth, nor anything to show a before and after value relative to the cost of compliance.

■   Moreover, there was proof that other options were open to the company: the generation of steam using the lumber waste,

the generation of electricity, disposal of the waste to other industries for use in generating steam or electricity and disposal by use of a landfill. It was shown the company owned some 7,000 acres in the surrounding area and the waste amounted only to the equivalent of one truck load per day. The mere fact that a partial use of one's property is burdened by regulation does not amount to a taking. *Andrus* v. *Allard*, 444 U.S. 318 (1979). In *Goldblatt* v. *Town of Hemstead, N.Y.*, 369 U.S. 597 (1962), the court said:

> There is no set formula to determine where regulation ends and taking begins. Although a comparison of values before and after is relevant . . . it is by no means conclusive, see *Hadacheck* v. *Sebastian*, 239 U.S. 394 (1915) where a diminution in value from $800,000 to $60,000 was upheld. How far regulation may go before it becomes a taking we need not now decide, for there is no evidence in the present record which even remotely suggests that prohibition of further mining will reduce the value of the lot in question. Indulging in the usual presumption of constitutionality, we find no indication that the prohibitory effect of Ordinance No. 16 is sufficient to render it an unconstitutional taking if it is otherwise a valid police regulation.

That language fits the state of this record in that the company has not shown compliance with the regulation would be commensurate to a taking of its property.

### III

Ark. Stat. Ann. § 82-1936 provides that in exercising its powers under the Arkansas Water and Air Pollution Control Act the Department shall consider a number of factors: prevailing wind directions and velocities, existing physical conditions and topography, temperatures, humidity and other atmospheric conditions, possible chemical reactions between air contaminants, the availability of air-cleaning devices and their economic feasibility, and other factors.

Black argues that because these were not specifically considered in connection with the Department's inspection of Black's operation and because there was little or no testimony concerning these factors it was error for the chancellor not to require the Department to make specific findings on each factor before

granting an injunction.

We disagree with that interpretation. Black is correct in urging the Department is under a mandate to consider the factors set out in the act in adopting its rules and regulations, but we find nothing in the act suggesting the legislature intended these factors to be applied in each specific instance. We believe the factors were intended to have a general application, to apply to classes, rather than to individual cases.

## IV

Black's Lumber Company's final contention is the chancellor erred in not finding it exempt under Ark. Stat. Ann. § 82-1934 (Repl. 1976) which excludes "agricultural operations in the growing or harvesting of crops and the raising of fowl or animals" from compliance with the act.

Black argues that trees are a crop, gathered much as other crops are harvested and the milling process simply changes them to a different form of raw material.

Our task is to determine the legislative intent from the language used, *Lyon* v. *White River-Grand Prairie Irrigation District*, 281 Ark. 286, 664 S.W.2d 441 (1984), which in this instance is simply "the growing or harvesting of crops. . . ." "To harvest" is defined as "to reap or gather, as any crop, material or result, to gather in a crop." Webster's New International Dictionary, Second Edition. It seems clear a tree is harvested when it is cut and gathered at some point convenient to the purpose. But when the milling operation begins, the harvesting process has ended and the crop begins a transformation from raw material to marketable product. We cannot say the chancellor's finding on this issue was clearly erroneous.

Since we uphold the constitutionality of the Arkansas Water and Air Pollution Act, we need not decide whether there was sufficient compliance with Ark. Stat. Ann. § 34-2510 (Repl. 1962). *Estate of Epperson*, 284 Ark. 35, 679 S.W.2d 792 (1984).

The decree is affirmed.