The Honorable Sarah S. Agee State Representative 11898 Sage Road Prairie Grove, AR 72753-9168
Dear Representative Agee:
This is in response to your request for an opinion on the following two questions:
 1. Some cities and counties require utility and road easements when private property is divided. Does this requirement fall under the 5th
Amendment of the United States Constitution and Article 2 Section 22 of the Arkansas Constitution, thereby requiring "just compensation" be paid?
 2. Does the city have the authority to require an easement on divided property that is outside the corporate limits?
RESPONSE
With respect to your first question, as a general proposition, any ordinance or adjudicative determination by a county or city requiring that a developer grant utility and road easements as a condition of development certainly is susceptible of analysis under the takings clauses of U.S. Const. art. 5 and Ark. Const. art. 2, § 22. Determining whether such a requirement constitutes a taking in any particular instance will entail conducting a factual inquiry of the sort I am neither equipped nor authorized to undertake. However, as a general proposition, I strongly doubt a court would characterize as a taking a city or county conditioning development on the developer's providing reasonable road and utility easements. With respect to your second question, the Arkansas Code defines a number of circumstances under which a municipal corporation will have authority to impose easement restrictions as a condition of development beyond corporate limits.
Question 1: Some cities and counties require utility and road easementswhen private property is divided. Does this requirement fall under the5th Amendment of the United States Constitution and Article 2 Section22 of the Arkansas Constitution, thereby requiring "just compensation" bepaid?
Counties are authorized to require subdivision developers to provide utility and road easements pursuant to A.C.A. § 14-17-208, which provides in pertinent part:
 (a) The county planning board may prepare and, after approval by the county quorum court, shall administer the ordinance controlling the development of land. The development of land includes, but is not limited to, the provision of access to lots and parcels, the provision of utilities, the subdividing of land into lots and blocks, and the parceling of land resulting in the need for access and utilities.
 (b) The ordinance controlling the development of land may establish or provide for minimum requirements as to:
* * *
 (2) The design and layout of the subdivision, including standards for lots and blocks, streets, public rights-of-way, easements, utilities, and other similar items;
 (3) The standards for improvements to be installed by the developer at his expense, such as street grading and paving, curbs, gutters, and sidewalks, water, storm, and sewer mains, street lighting, and other amenities.
 (c) The ordinance shall require that all plats of two (2) or more parcels be submitted to the board for its approval and certification.
 (d) The ordinance may require the installation or assurance of installation of required improvements before plat approval. Further, the regulations may provide for the dedication of all rights-of-way to the public.
* * *
 (g) The ordinance shall require the development to conform to the official plan currently in effect. The ordinance may require the reservation or reasonable equivalent contribution of cash, other land, or considerations as approved by the board for future public acquisition of land for community or public facilities indicated in the official plan. The reservation may extend over a period of not more than one (1) year from the date of recording the final plat with the county recorder.
Cities are authorized to impose similar requirements pursuant to A.C.A. § 14-56-417, which provides:
 (a)(1) Following adoption and filing of a master street plan, the commission may prepare and shall administer, after approval of the legislative body, regulations controlling the development of land.
(2) The development of land includes, but is not limited to:
(A) The provision of access to lots and parcels;
(B) The extension or provision of utilities;
(C) The subdividing of land into lots and blocks; and
 (D) The parceling of land resulting in the need for access and utilities.
 (b)(1) The regulations controlling the development of land may establish or provide for the minimum requirements as to:
(A) Information to be included on the plat filed for record;
 (B) The design and layout of the subdivision, including standards for lots and blocks, street rights-of-way, street and utility grades, and other similar items; and
 (C) The standards for improvements to be installed by the developer at his own expense such as street grading and paving; curbs, gutters, and sidewalks; water, storm and, sewer mains; street lighting; and other amenities.
 (2)(A) The regulations may permit the developer to post a performance bond in lieu of actual installation of required improvements before plat approval.
 (B) They may provide for the dedication of all rights-of-way to the public.
 (3)(A) The regulations may govern lot or parcel splits, which is the dividing of an existing lot or parcel into two (2) or more lots or parcels.
 (B) No deed or other instrument of transfer shall be accepted by the county recorder for record unless the deed or other instrument of transfer is to a lot or parcel platted and on file or accompanied with a plat approved by the commission.
 (4) The regulations shall establish the procedure to be followed to secure plat approval by the commission.
 (5)(A) The regulations shall require the developer to conform to the plan currently in effect.
 (B)(i) The regulations may require the reservation, for future public acquisition of land for community or public facilities indicated in the plan.
 (ii) This reservation may extend over a period of not more than one (1) year from the time the public body responsible for the acquisition of reserved land is notified of the developer's intent.
 (6) When a proposed subdivision does not provide areas for a community or public facility based on the plans in effect, the regulations may provide for reasonable dedication of land for such public or community facilities, or for a reasonable equivalent contribution in lieu of dedication of land, such contribution to be used for the acquisition of facilities that serve the subdivision.
 (c) Within the area within which the municipality intends to exercise its territorial jurisdiction as indicated on the planning area map, the county recorder shall not accept any plat for record without the approval of the planning commission.
These statutes thus invest the governing bodies of cities and counties with the power legislatively to approve regulations that condition development upon the developer's providing specified easements and improvements and, likewise if authorized by ordinance, dedicating rights-of-way to the public without compensation.
Both the Fifth Amendment to the U.S. Constitution and Article 2, § 22 of the Arkansas Constitution prohibit the taking of private property for public use without just compensation. With respect to what constitutes a taking under the Fifth Amendment, my predecessor has offered the following analysis:
 Whether a "taking" has actually occurred . . . is a question of fact, but it has been held that when the owner of real property has been called upon to sacrifice all economically beneficial use of the property he has suffered a "taking." Lucas v. South Carolina Coastal Council, 502 U.S. 966 (1991). It has been held that in order to show a "taking" a property owner must show either that the regulation does not advance a legitimate state interest or that it denies the property owner all economically viable use of his or her land. Carpenter v. Tahoe Regional Planning Agency, 804 F. Supp. 1316 (D.Nev. 1992).
Ark. Op. Att'y Gen. No. 95-189. In the attached Ark. Op. Att'y Gen. No.99-320, I elaborated on this standard as follows:
 The Court in Lucas made substantial changes in the law of regulatory takings. The Court announced two instances in which a "categorical" or "per se" taking will occur. If the land use regulation "does not substantially advance legitimate state interests" or denies an owner "all economically beneficial uses" of his land, a per se "taking" will be found. Id. at 1019. . . . In many cases, the plaintiff concedes the existence of a "legitimate state interest" and focuses his efforts instead on trying to prove the second factor leading to a per se taking — that the regulation deprives him of "all economically beneficial use" of his land. See e.g., Reahard v. Lee County, 968 F.2d 1131 (11th Cir. 1992) (stating that just compensation claims admit and assume that the subject regulation substantially advances a legitimate government interest); Lucas, supra and Penn Central Transportation Co. v. New York City, 438 U.S. 104 (1978). The Court has called the existence of the latter situation, however," an extraordinary circumstance," and "relatively rare." Lucas, supra at 1017, 1018.
* * *
 The [Lucas] Court indicated . . . that in most cases, a property owner will not be deprived of "all economically beneficial uses" of his property. . . . In such case, a plaintiff may not claim the benefit of the "categorical" formula announced in Lucas, and the question will be determined by application of the "balancing test" developed through pre-Lucas precedents. See generally, Lucas, supra, at n. 8 and Penn Central Transportation Co. v. New York City, 438 U.S. 104 (1978). The Court in Penn Central employed a balancing test to determine whether a particular regulation had "gone too far" and thus constituted a "taking" for purposes of the Fifth Amendment. Three separate criteria are usually given consideration under this test: 1) the character of the government regulation; 2) the economic impact of the regulation on the plaintiff; and 3) the extent to which the regulation interferes with distinct investment-backed expectations of the property owner. This test employs the type of "ad hoc factual analysis" referred to by the Lucas Court. The Court also noted that a mere diminution in property value, even if significant, is not sufficient to establish a "taking." Penn Central, supra at 131. See also in Arkansas, Barrett v. Poinsett County, 306 Ark. 270, 811 S.W.2d 324 (1991); Winters v. State, 301 Ark. 127, 782 S.W.2d 566 (1990); and J.W. Black Lumber Co. v. Arkansas Department of Pollution Control, 290 Ark. 170, 717 S.W.2d 807 (1986). The Court in Penn Central, quoting a 1922 precedent, noted that: "`Government could hardly go on if to some extent values incident to property could not be diminished without paying for every such change in the general law.'" Id. at 124, quoting Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 413
(1922).
Having acknowledged the Court's distinction in Lucas between "per se" categories of takings and those identified as takings by applying a balancing test, I should note that such taxonomic distinctions are not always easy to apply. In Miller, Triple Ways to Take: The Evolution andMeaning of the Supreme Court's Three Regulatory Taking Standards, 71 Temp. L.R. 243 (1998), the commentator distinguishes the three variant modes of analysis but acknowledges in the process that the categorical test will necessarily involve a balancing of interests. Id. at 248 n. 21 and 279. In differentiating the three standards, Miller further concedes that their applications "have sometimes been arbitrary and complex." Id.
at 245. Indeed, he even concedes that numerous commentators have failed altogether to glean three distinct standards from the Supreme Court precedents. Id. at 247-48.
Post-Lucas case law dealing with the takings clause has made no further references to the particular balancing test described in Lucas footnote 8. Instead, the Court has adopted a somewhat different analytical approach, the range and applicability of which is not entirely clear. InDolan v. City of Tigard, 512 U.S. 274, 383-85 (1994), the Court summarized the law as follows:
 The Takings Clause of the Fifth Amendment of the United States Constitution, made applicable to the States through the Fourteenth Amendment, Chicago, B. Q.R. Co. v. Chicago, 166 U.S. 226, 239
(1897), provides: "[N]or shall private property be taken for public use, without just compensation." One of the principal purposes of the Takings Clause is" to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." Armstrong v. United States, 364 U.S. 40, 49
(1960). Without question, had the city simply required petitioner to dedicate a strip of land along Fanno Creek for public use, rather than conditioning the grant of her permit to redevelop her property on such a dedication, a taking would have occurred. Nollan, supra, at 831. Such public access would deprive petitioner of the right to exclude others, "one of the most essential sticks in the bundle of rights that are commonly characterized as property." Kaiser Aetna v. United States, 444 U.S. 164, 176 (1979).
 On the other side of the ledger, the authority of state and local governments to engage in land use planning has been sustained against constitutional challenge as long ago as our decision in Village of Euclid v. Ambler Realty Co., 272 U.S. 365 (1926). "Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law." Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 413 (1922). A land use regulation does not effect a taking if it "substantially advance[s] legitimate state interests" and does not "den[y] an owner economically viable use of his land." Agins v. City of Tiburon, 447 U.S. 255, 260
(1980).
 The sort of land use regulations discussed in the cases just cited, however, differ in two relevant particulars from the present case. First, they involved essentially legislative determinations classifying entire areas of the city, whereas here, the city made an adjudicative decision to condition petitioner's application for a building permit on an individual parcel. Second, the conditions imposed were not simply a limitation on the use petitioner might make of her own parcel, but a requirement that she deed portions of the property to the city. In Nollan, supra, we held that governmental authority to exact such a condition was circumscribed by the Fifth and Fourteenth Amendments. Under the well settled doctrine of "unconstitutional conditions," the government may not require a person to give up a constitutional right — here the right to receive just compensation when property is taken for a public use — in exchange for a discretionary benefit conferred by the government where the benefit sought has little or no relationship to the property. See Perry v. Sindermann, 408 U.S. 593 (1972); Pickering v. Board of Ed. of Township High School Dist. 205, Will Cty., 391 U.S. 563, 568 (1968).
(Footnotes omitted.)
The Court went on to articulate the following standard:
 In evaluating petitioner's claim, we must first determine whether the "essential nexus" exists between the "legitimate state interest" and the permit condition exacted by the city. Nollan, 483 U.S., at 837. If we find that a nexus exists, we must then decide the required degree of connection between the exactions and the projected impact of the proposed development.
Id. at 386. The Court then described the "required degree of connection" as follows:
 We think a term such as "rough proportionality" best encapsulates what we hold to be the requirement of the Fifth Amendment. No precise mathematical calculation is required, but the city must make some sort of individualized determination that the required dedication is related both in nature and extent to the impact of the proposed development.
Id. at 391 (footnote omitted).
It seems unlikely that a reviewing court would apply the rough-proportionality standard in addressing the situation in which a city or county conditions development on the granting of utility or road easements. As reflected in the foregoing, the Court in Dolan suggested that it developed its new "rough proportionality" standard to apply to instances in which the regulation (a) applied to an individual parcel of property and/or (b) entailed an actual conveyance of title to the property. I use the term "and/or" in the preceding sentence advisedly, since the Court's pronouncements could be read as suggesting that these two elements are conjunctive, not disjunctive. However, the Court has never indicated that the rough-proportionality test would supplant the balancing test referenced in Lucas when a condition placed on development stops short of requiring an outright deeding of a fee interest in property to the public.
In Goss v. City of Little Rock, 90 F.3d 306 (8th Cir. 1996), the Eighth Circuit Court of Appeals considered whether a city might condition its approval of a citizen's rezoning request upon his dedicating certain of his property to the public for road expansion. The court began its analysis by reciting the familiar formulation that an ordinance applied to specific property "`effects a taking if the ordinance does not substantially advance legitimate state interests or denies an owner economical viable use of his land.' Agins, 447 U.S. at 260."90 F.3d at 308. The court then offered the following regarding conditioning regulatory approval:
 The Little Rock action in question was the conditioning of its approval of the rezoning request on the dedication by Goss of a portion of his property. The use of conditions in conjunction with the exercise of police powers has been the subject of a great deal of judicial attention. See, e.g., Nollan v. California Coastal Comm'n, 425 U.S. 825
[sic: 483 U.S. 825] (1987); Dolan v. City of Tigard, 114 S.Ct. 2309
(1994). This attention derives from the frank acknowledgement that states might use conditions in combination with the exercise of their discretionary power to elude the confines of the Constitution and accomplish what might otherwise be clearly impermissible.
Id. at 309. The court then remanded the case for a factual inquiry into "whether the demanded dedication bears some rough proportionality to the project impact of the proposed rezoning." Id. at 310.[1]
The U.S. Supreme Court has most recently found occasion to address this question in Monterey v. Del Monte Dunes at Monterey, Ltd., 526 U.S. 687
(1999), in which a landowner contended the environmental conditions imposed on his planned development were so onerous that the city had effectively denied him the chance to develop. The Court remarked:
 Although in a general sense concerns for proportionality animate the Takings Clause, see Armstrong v. United States, 364 U.S. 40, 49 (1960) ("The Fifth Amendment's guarantee . . . was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole"), we have not extended the rough-proportionality test of Dolan beyond the special context of exactions — land-use decisions conditioning approval of development on the dedication of property to public use. See Dolan, supra, at 385; Nollan v. California Coastal Comm'n, 483 U.S. 825, 841
(1987). The rule applied in Dolan considers whether dedications demanded as conditions of development are proportional to the development's anticipated impacts.
Id. at 702-03. Although this passage makes clear that the rough-proportionality test applies in at least some instances to conditional land development decisions, it leaves unanswered whether the "dedication of property to public use" must entail an actual conveyance of title or might entail merely granting an easement.[2] As suggested in the discussion above, whereas the factual background of Dolan involved a requirement of outright conveyance, the Court's general statements of principle leave open the possibility that the rough-proportionality test will apply as well if the required dedication is one of an easement.
However, the Court in Monterey made clear that the rough-proportionality test will not apply in at least one instance. The Court noted that the rough-proportionality test "was not designed to address, and is not readily applicable to, the much different questions arising where, as here, the landowner's challenge is based not on excessive exactions but on denial of development." Id. at 703.[3] Without elaboration, the Court in Monterey merely noted that the jury instructions at issue were "consistent with our previous general discussions of regulatory takings liability.[4] See Dolan, supra, at 385; Lucas v. South Carolina CoastalCouncil, 505 U.S. 1003, 1016 (1992); Yee v. Escondido, 503 U.S. 519, 534
(1992); Nollan, supra, at 834; Keystone Bituminous Coal Assn. v.DeBenedictis, 480 U.S. 470, 485 (1987); United States v. RiversideBayview Homes, Inc., 474 U.S. 121, 126 (1985); Agins v. City of Tiburon,447 U.S. 255, 260 (1980)." 526 U.S. at 704. Notwithstanding the inclusion of Lucas in this list, all of the pinpoint citations recited in this catalog, including the specific reference to Lucas, support only the standard proposition that an ordinance "effects a taking if the ordinance does not substantially advance legitimate state interests, see Nectow v.Cambridge, 277 U.S. 183, 188 (1928), or denies an owner economically viable use of his land, see Penn Central Transp. Co. v. New York City,438 U.S. 104, 138, n. 36 (1978)." Agins v. Tiburon, 447 U.S. 255, 260
(1980).
Although it appears clear that a court will look for a legitimate state interest and a denial of an owner's "viable use" of restricted property in testing a requirement that a developer provide utility or road easements, it is not entirely certain in the wake of Dolan and Monterey
whether the court will in the alternative — or, for that matter, as a stage in testing the legitimacy of a purported state interest — apply either the rough-proportionality test or the balancing test referred to in Lucas footnote 8. It seems likely that the court will conduct one or the other variety of balancing. However, Monterey clearly establishes that the rough-proportionality standard will not apply if governmental regulation has the effect of denying development altogether.[5]
The Arkansas Supreme Court's pronouncements on the standard to be applied in reviewing an Article 2, § 22 challenge are likewise not entirely clear. The general underlying standard appears to be that set forth in the following:
 Article 2, section 22 of the Arkansas Constitution provides that "[t]he right of property is before and higher than any constitutional sanction; and private property shall not be taken, appropriated or damaged for public use, without just compensation therefor." We have interpreted this provision to require compensation for a taking when a municipality acts in a manner which substantially diminishes the value of a landowner's land, and its actions are shown to be intentional. Robinson v. City of Ashdown, 301 Ark. 226, 783 S.W.2d 53 (1990).
Thompson v. City Of Siloam Springs, 333 Ark. 351, 357, 969 S.W.2d 639
(1998). In J.W. Black Lumber Co. v. Arkansas Department Of PollutionControl and Ecology, 290 Ark. 170, 174, 717 S.W.2d 807 (1986), the court further explained:
 The law recognizes a point at which regulation so restricts the use of property that it exceeds mere regulation and becomes a taking. When that line is crossed, both Constitutions require that the taking be in accordance with the laws of eminent domain. Mr. Justice Holmes summarized the pertinent principle of law in Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 413 (1922):
 Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law. As long recognized, some values are enjoyed under an implied limitation and must yield to the police power. But obviously the implied limitation must have its limits, or the contract and due process clauses are gone. One fact for consideration in determining such limits is the extent of the diminution. When it reaches a certain magnitude, in most if not in all cases there must be an exercise of eminent domain and compensation to sustain the act. So the question depends upon the particular facts. The greatest weight is given to the judgment of the legislature, but it always is open to interested parties to contend that the legislature has gone beyond its constitutional power.
Over the years, the court has offered varying formulations as to what standard should be applied in making the factual determination of whether a taking has occurred. See, e.g., Shellnut v. Arkansas State Game FishCommission, 222 Ark. 25, 29, 258 S.W.2d 570 (1953) ("serious interruption of the common and necessary use" of property provides a basis for requiring compensation under art. 2, § 22); Robinson v. City of Ashdown,301 Ark. 226, 232, 783 S.W.2d 53 (1990) (requiring compensation when the government acts in a manner which "substantially diminishes" the land's value); Arkansas State Highway Commission v. McNeill, 238 Ark. 244, 245,381 S.W.2d 425 (1964) (finding a compensable injury when there is a "special damage" to the property owner, as by a change in the grade of the street abutting his property or by a destruction of his access to a public street); Sewer Improvement District No. 1 of Wynne v. Fiscus,128 Ark. 250, 254, 193 S.W. 521 (1917) (requiring a "direct, substantial injury peculiar to [the property owner] and not suffered by the general public.")
In Black Lumber Co., the court acknowledged its own inability to fashion any bright-line test:
 In Goldblatt v. Town of Hemstead, N.Y., 369 U.S. 597 (1962), the court said:
 There is no set formula to determine where regulation ends and taking begins. Although a comparison of values before and after is relevant . . . it is by no means conclusive, see Hadacheck v. Sebastian, 239 U.S. 394 (1915) where a diminution in value from $800,000 to $60,000 was upheld. How far regulation may go before it becomes a taking we need not now decide, for there is no evidence in the present record which even remotely suggests that prohibition of further mining will reduce the value of the lot in question. Indulging in the usual presumption of constitutionality, we find no indication that the prohibitory effect of Ordinance No. 16 is sufficient to render it an unconstitutional taking if it is otherwise a valid police regulation.
290 Ark. at 175.
The Arkansas Supreme Court has addressed the question raised in your request in City of Jonesboro v. Vuncannon, 310 Ark. 366 (1992), which involved a city's refusal to replat three lots for development unless the owner deeded nine feet of frontage to the city for a right of way. The owner challenged as unconstitutional A.C.A. § 14-56-417(b)(2)(B), which authorizes the city by regulation to provide for the dedication of all rights-of-way to the public. Although the court declined to reach the constitutional issue, it did offer in passing the following dictum, which suggests that it would not find objectionable conditions of the sort set forth in your request: "No one questions the power of the City to require dedication of rights-of-way in land which is the subject of an initial subdivision plat." 310 Ark. at 374. However, I must stress that this pronouncement is dictum.
The court has further touched on the substance of your request inNewton, Circuit Clerk v. American Security Co., 201 Ark. 943,148 S.W.2d 311 (1941), in which a property owner challenged the refusal of the Little Rock City Planning Board and the Pulaski County Planning Board to approve the plat of a proposed development unless the property owner dedicated ten feet of the development's property to the public as right-of-way included in Base Line Road and Geyer Springs Road. In declining to require the clerk to accept the plat, the court offered the following analysis:
 Appellee first contends that the lower court was correct in holding that no authority existed for the action of the Planning Board because no provision was made for compensation to the landowner. Attention is called to 22 of art. 2 of the Constitution of the State of Arkansas which provides that private property shall not be taken, appropriated or damaged for public use without just compensation therefor. Of course one's property cannot be taken for public use without compensation, but the evidence in this case clearly shows that no one is attempting to take the property of appellee. The record shows that the appellee itself is seeking to take advantage of the County and City Planning Boards and undertaking to file a plat, and seeks by this proceeding to compel the clerk to record the plat, although when submitted to the Planning Boards, both the County and City Planning Boards refused to approve appellee's plat. There was no law requiring petitioner to file a plat, and if the appellee or the planning boards or anyone else sought to take or damage appellee's property without just compensation therefor, such persons would be prohibited from doing so.
201 Ark. at 950-51. This passage verges on suggesting, in what strikes me as an archaic formulation in light of subsequent U.S. Supreme Court cases, that conditioning development can never involve a taking because no one is forcing the developer to submit a plat. I strongly doubt the current Supreme Court would follow this reasoning if faced with the issue.
Finally, in Calabria v. City of Fayetteville, 277 Ark. 489,644 S.W.2d 249 (1982), the Supreme Court reversed a trial court's ruling that the City of Fayetteville could condition development along controlled access highways upon the developer's constructing a service road at his expense and dedicating the road to the city. The court noted the existence of a state law authorizing "acquisition of private property by the state, county or city for the purpose of constructing controlled access facilities and service roads." Id. at 491. The court further reported that the highway department had initially deposited the value of the property into the registry of the court, but had subsequently withdrawn a significant portion of this deposit upon discovering the existence of the local ordinance. Id. at 492. In deeming this constitutionally impermissible, the court offered the following analysis:
 We held in Arkansas State Highway Com. v. Arkansas Power Light, Co., [231 Ark. 307, 330 S.W.2d 77 (1952),] that a city could not acquire property under the guise of police power for construction of streets. That is, in effect, what the city of Fayetteville is attempting to do in the present case. However, looking in depth at the two sets of statutes, it is evident that the one (Ark. Stat. Ann. 19-2829) deals exclusively and comprehensively with subdivisions across the state, while the other (Ark. Stat. Ann. 76-2201, et seq.) addresses itself to controlled access facilities as defined in the statute. A subdivision is not a controlled access facility, even though it may abut one. It does not appear inconsistent considering the separate purposes of the aforementioned acts, that a developer should receive compensation for giving up a right-of-way along a controlled access facility while having to relinquish title and control of the streets within a subdivision without being compensated. . . . If we were to permit ordinance 1661 to control, it would be a taking of private property without due process and in violation of the Constitution of the State of Arkansas, Article 2[,] 22, and this we cannot allow.
Id. at 492-93. This passage appears to accept, without elaborate constitutional analysis, that the legislature was justified in requiring the dedication of property as a condition of subdivision development. In light of subsequent federal case law, I am uncertain that the Arkansas Supreme Court would be equally deferential if faced with the issue today.
As the foregoing should suggest, any determination whether a particular decision to require utility or road easements constitutes a taking can only be made by reviewing the facts. As an officer of the executive branch of government, I am neither qualified nor empowered to make such a determination. However, as a general proposition, it would appear to serve a legitimate state interest for a city or county, in the course of pursuing the public welfare, to require that the residents of subdivided property be ensured by easement reasonable access to utilities and roads through a subdivision. Again as a general proposition, it would further appears that providing easements guaranteeing these services would enhance, rather than diminish, the value of the property. Although I cannot formally opine to this effect, I believe a court would probably not characterize a reasonable requirement of easements as a taking under either the state or federal constitution.
Finally, I should note that your question might be read as applying to the situation in which a county court orders a landowner to grant a landlocked adjoining landowner an easement for ingress and egress. As the Supreme Court noted in Yates v. Sturgis, 311 Ark. 618, 620-21, 846 S.W.2d (1993):
 The statute, Ark. Code Ann. 27-66-401 (1987), in the material part, provides:
 When the lands . . . of any owner [are] so situated as to render it necessary to have a private road from such lands . . . over the lands of any other person and the other person refuses to allow that owner the private road, then it shall be the duty of the county court . . . [to determine whether such a private road is necessary and, if it is necessary, to exercise the power of eminent domain at the expense of the person seeking the road].
 Throughout the years we have construed our present state constitution and the above-quoted statute to give the county court the power of eminent domain to allow access to landlocked tracts. See, e.g., Dowling v. Erickson, 278 Ark. 142, 644 S.W.2d 264 (1983); Bowden v. Oates, 248 Ark. 577, 452 S.W.2d 831 (1970); McVay v. Stupenti, 227 Ark. 224, 297 S.W.2d 769 (1957); Pippin v. May, 78 Ark. 18, 93 S.W. 64 (1906).
As my immediate predecessor noted in Ark. Op. Att'y Gen. No. 98-009:
 . . . Yates v. Sturgis, 311 Ark. 618, 846 S.W.2d 633 (1993), reflects the Arkansas Supreme Court's adherence to the view that Ark. Const. art. 7, § 28 gives the county court jurisdiction over all public roads in the county including streets within a city. The court cited its previous decision in Sanderson v. Texarkana, 103 Ark. 529, 146 S.W. 105
(1912), to this effect. Yates, 311 Ark. at 620. A statute authorizing the county court to exercise the power of eminent domain to open roads to landlocked tracts was thus deemed applicable within the city boundaries. Id. at 622.
Question 2: Does the city have the authority to require an easement ondivided private property that is outside the corporate limits?
It depends. Chapter 56 of title 14 of the Code deals with city planning and municipal building and zoning regulations. Section 14-56-402 of the Code provides:
 Cities of the first and second class and incorporated towns shall have the power to adopt and enforce plans for the coordinated, adjusted, and harmonious development of the municipality and its environs.
Subsection 14-56-413 of the Code, entitled "Territorial jurisdiction," provides in pertinent part:
 (a)(1)(A) The territorial jurisdiction of the legislative body of the city having a planning commission, for the purpose of this subchapter, shall be exclusive and shall include all land lying within five (5) miles of the corporate limits.
 (B) If the corporate limits of two (2) or more municipalities of the first or second class are less than ten (10) miles apart, the limits of their respective territorial jurisdictions shall be a line equidistant between them, or as agreed on by the respective municipalities.
 (2)(A) Cities now having eight thousand (8,000) population or more and situated on navigable streams shall have the authority to administer and enforce planning and zoning ordinances outside their corporate limits as follows:
 (i) For cities of eight thousand (8,000) to fifty thousand (50,000) population, the jurisdictional area will be one (1) mile beyond the corporate limits;
 (ii) For cities of fifty thousand (50,000) to one hundred fifty thousand (150,000) population, the jurisdictional area will be two (2) miles beyond the corporate limits;
 (iii)(a) For cities of one hundred fifty thousand (150,000) population and over, the jurisdictional area will be three (3) miles beyond the corporate limits.
In my opinion, unless one of the above-recited conditions applies to extend jurisdiction beyond the city or town's corporate limits, the municipal corporation will have authority to impose conditions only within its own boundaries.
I should further note that even assuming that one of the above referenced statutory conditions applies to afford the city extra-territorial jurisdiction, the city's power to condition development within this area will still be contingent upon its having "exercised" that jurisdiction — a circumstance I most recently had occasion to consider in the enclosed Ark. Op. Att'y Gen. No. 2001-234, in which I addressed the relationship between county and city control over subdivision development within the area of the city's extra-territorial jurisdiction. Without repeating my very recent analysis, I will simply excerpt the following conclusions:
 I concluded in Opinion 2001-160 that the city will have planning jurisdiction over the five-mile extraterritorial area if that area is included in the planning area map, regardless of whether the city has adopted plans for the area. Id. at 2. . . .
* * *
 If it is not entirely clear, it may at least reasonably be inferred . . . that the county's subdivision jurisdiction in a city's extra-territorial area depends upon the city's" exercise" of its jurisdiction in that area. Unfortunately, the County Code offers no insight into what is meant by the city's "exercised extra-territorial jurisdiction." We do know, however, from the municipal planning Code sections, that the county recorder looks to the planning area map to determine whether plat approval must be obtained from the city planning commission. A.C.A. § 14-56-417(c), supra. Apparently, the presumption is that the city will exercise its subdivision jurisdiction in the area included on the map. If the area is not included, I believe it will be presumed that the city is not exercising its jurisdiction and that the county planning board must approve plats for record. See A.C.A. § 14-17-208, supra. However, because there is no explicit Code provision identifying the planning area map as the only evidence that the city's subdivision jurisdiction is" being exercised" (A.C.A. § 14-17-208(i)), it is conceivable that fact questions could arise regarding the exercised jurisdiction. As a general matter, however, I believe it is correct to say that the planning map will determine the city's subdivision jurisdiction.
(Footnote omitted.)[6] In any event, regardless of whether the city or the county planning commission is charged with the ultimate decision whether to approve and file a particular subdivision plat, I believe the question of whether such approval and filing might be conditioned upon the granting of utility and road easements must be answered by applying the principles discussed in my response to your first question.
Assistant Attorney General Jack Druff prepared the foregoing, which I hereby approve.
Sincerely,
MARK PRYOR Attorney General
MP:JD/cyh
Enclosures
[1] In Goss v. City of Little Rock, 151 F.3d 861 (8th Cir. 1998), the court affirmed the trial court's subsequent determination that the city's condition amounted to a taking.
[2] Black's Law Dictionary (7th ed. 1999) defines the term "dedication" in the alternative as "[t]he donation of land or creation of an easement for public use."
[3] This pronouncement is dictum because the Court ruled that it need not even reach this issue given that appellant had failed to raise it below in the form of a challenge to a jury instruction. Id. at 704.
[4] The Court summarized the substance of the challenged instruction as follows:
 At the close of argument, the District Court instructed the jury it should find for Del Monte Dunes if it found either that Del Monte Dunes had been denied all economically viable use of its property or that "the city's decision to reject the plaintiff's 190 unit development proposal did not substantially advance a legitimate public purpose." App. 303. With respect to the first inquiry, the jury was instructed, in relevant part, as follows:
 "For the purpose of a taking claim, you will find that the plaintiff has been denied all economically viable use of its property, if, as the result of the city's regulatory decision there remains no permissible or beneficial use for that property. In proving whether the plaintiff has been denied all economically viable use of its property, it is not enough that the plaintiff show that after the challenged action by the city the property diminished in value or that it would suffer a serious economic loss as the result of the city's actions." Ibid.
With respect to the second inquiry, the jury received the following instruction:
 "Public bodies, such as the city, have the authority to take actions which substantially advance legitimate public interest[s] and legitimate public interest[s] can include protecting the environment, preserving open space agriculture, protecting the health and safety of its citizens, and regulating the quality of the community by looking at development. So one of your jobs as jurors is to decide if the city's decision here substantially advanced any such legitimate public purpose.
 "The regulatory actions of the city or any agency substantially advanc[e] a legitimate public purpose if the action bears a reasonable relationship to that objective.
 "Now, if the preponderance of the evidence establishes that there was no reasonable relationship between the city's denial of the . . . proposal and legitimate public purpose, you should find in favor of the plaintiff. If you find that there existed a reasonable relationship between the city's decision and a legitimate public purpose, you should find in favor of the city. As long as the regulatory action by the city substantially advances their legitimate public purpose, . . . its underlying motives and reasons are not to be inquired into." Id., at 304.
526 U.S. at 700-01.
[5] In adopting this position, the Court appears to have diverged from the Eighth Circuit Court's statement of the law in the appeal from the remand in Goss. According to the Eighth Circuit Court, the rough-proportionality test applied even though Goss had refused to accede to the condition, as opposed to accepting an unconstitutional condition as had occurred in Dolan. 151 F.3d at 864 n. 2. The court characterized this distinction as "a mere technicality" without analytical consequences. Id. However, the Court's pronouncements in Monterey suggest that Goss' situation should have been treated as a denial of development that was not subject to a rough-proportionality analysis.
[6] As I further noted in Opinion No. 2001-234, even if a city has included an area within its extra-territorial jurisdiction on its planning area map, the county retains certain measures of control:
 The county generally retains the power to enforce its zoning ordinance in the growth area of a city that is not situated on a navigable stream. See A.C.A. 14-17-209 and Op. Att'y Gen. 99-274. It must also be recognized that the county court and the county judge retain certain authority, both constitutional and statutory, over matters relating to roads and the internal improvement of the county. Ark. Const. art. 7, § 28 and amend. 55, § 3. As I have noted in several previous opinions, the city must yield to the county in the event of a conflict between the city's exercise of its jurisdiction under the planning statutes and the authority of the county court or county judge with respect to county roads and county internal improvement. See generally Op. Att'y Gen. Nos. 2001-038, 98-009, 99-274, and 97-181. Whether such a conflict exists will, of course, involve a question of fact in each instance. See Op. 99-274, citing Yates v. Sturgis, 311 Ark. 618, 846 S.W.2d 633
(1993) and Butler v. City of Little Rock, 231 Ark. 834, 332 S.W.2d 812
(1960).
In a footnote to this passage, I observed: "Cities with populations of 8,000 or more and situated on navigable streams have the authority to plan and zone outside their corporate limits. A.C.A. §14-56-413(a)(2)(A)."